98 P.3d 803 (2004)
152 Wash.2d 546
STATE of Washington, Respondent,
v.
Laris L. PETE, Petitioner.
No. 74544-7.
Supreme Court of Washington, En Banc.
Argued June 30, 2004.
Decided October 14, 2004.
*804 Cheryl D. Aza, Washington Appellate Project, Seattle, for Petitioner.
Andrea Ruth Vitalich, King County Prosecutor's Office, Seattle, for Respondent.
ALEXANDER, C.J.
Laris Pete was convicted of second degree robbery in King County Superior Court. Following the Court of Appeals' affirmance of his conviction, we granted review. In his petition, Pete contends that he should be afforded a new trial because the jury improperly considered extrinsic evidence that was not admitted at trial. We agree with Pete and reverse the Court of Appeals.

I
On November 17, 2001, at approximately 1:00 a.m., Seattle Police Officers Linda Cook and Amy Branham were on routine patrol in West Seattle. While they were at the corner of Delridge Way and Southwest Orchard, a motorist drove up to their vehicle and informed them that "there's two guys beating up another guy right over there." Verbatim Report of Proceedings (VRP) (Mar. 12, 2002) at 99. The informant pointed to a location north of Delridge Way.
When Officers Cook and Branham arrived at the location designated by the informant, they saw Gregorio Olivares-Bahena lying on the ground with two individuals, Laris Pete and Herman Longtimesleeping, standing over him. The officers observed Longtimesleeping in the act of kicking Olivares-Bahena in the head. The officers also witnessed what they thought was Pete's attempt to take a case of beer from Olivares-Bahena's hands. As the officers parked their vehicle, they observed Pete complete the taking of the beer from Olivares-Bahena and begin walking away from Olivares-Bahena together with Longtimesleeping. After the officers commanded Pete and Longtimesleeping to stop, Pete complied. Longtimesleeping, however, fled from the scene but was apprehended by Officer Cook after a brief pursuit on foot. A search of Pete's pants pocket revealed two bottles of beer. A case of beer was found in a grassy area near where Pete was standing.
The police officers both observed that Olivares-Bahena had injuries to his face. Olivares-Bahena informed them that he was in the process of going to his home from a gas *805 station when he was approached by Pete and Longtimesleeping. He told the officers that he had engaged in a conversation with the two men and that they eventually asked him if they could have a beer. Olivares-Bahena said that he responded by giving each of them a beer. According to Olivares-Bahena, when they asked for more beer, he declined their request. He said that Longtimesleeping then struck him in the face. Olivares-Bahena indicated that the blow caused him to fall to the ground where he was then kicked by Longtimesleeping. He advised the officers that Longtimesleeping was the one who assaulted him while Pete attempted to take the case of beer out of his hands. All of the statements Olivares-Bahena made to the officers at the scene were admitted at trial as excited utterances pursuant to ER 803(a)(2).
Olivares-Bahena's testimony at trial differed in some respect from the statements he allegedly gave to the officers at the scene. He testified that he gave beer to Pete and Longtimesleeping so that the two men would leave him alone. Olivares-Bahena also testified that Longtimesleeping asked him for money after he had given Pete and Longtimesleeping the beer. He indicated that he responded by saying that he had no money. Olivares-Bahena testified, additionally, that he tried to move his wallet from his back pocket to his front pocket in order to prevent Longtimesleeping from taking it from him. In doing so, he fell and hit his head on the ground. He said that he did not remember if either of the defendants hit him after that.
While being transported to a police precinct station after his arrest, Pete told another officer that "he only took some beer" from Olivares-Bahena and that Longtimesleeping was the one who actually assaulted Olivares-Bahena. Clerk's Papers (CP) at 32. Pete also told the officer that Olivares-Bahena received facial injuries when he fell to the ground after wrestling with Longtimesleeping. At the precinct station, Pete signed a written statement, in which he indicated that Olivares-Bahena offered him a beer and at which time "the other guy [Longtimesleeping] ... came up." Id. at 33. His written statement also contained the assertion that Olivares-Bahena "handed" him the rest of the beer and that he then walked away as instructed by Olivares-Bahena. Id.
Pete and Longtimesleeping were charged together in King County Superior Court with robbery in the first degree. Before trial, a CrR 3.5 hearing was held. At the conclusion of this hearing, the trial court determined that the oral and written statements Pete gave to the police officers were admissible. Neither statement, however, was offered into evidence at trial. The jury was instructed on the lesser included crime of robbery in the second degree.
After deliberating for less than half a day, the jury informed the trial court that it had reached a verdict. Before the verdict was rendered, the trial judge told the parties that two documents had been inadvertently sent to the jury room. One document was the police officer's written report recounting statements that Pete allegedly made during the time he was being transported to the precinct station. The other was Pete's written and signed statement. The trial court noted that as soon as it learned that unadmitted documents had been furnished to the jury, the bailiff retrieved the officer's statement and "grabbed" a second document. VRP (Mar. 14, 2002) at 68. The latter document was mistakenly retrieved because it had been admitted into evidence. When this error was realized, the bailiff returned to the jury room to replace the admitted document and retrieve the other unadmitted document. The bailiff then instructed the jurors to disregard the unadmitted documents during their deliberations.[1] After the parties were informed of these happenings, they agreed that the jury's verdict should be received and that the trial court should then poll the jurors about who saw and/or read the documents that should not have gone to the jury room.
*806 The jury acquitted Pete and Longtimesleeping of the charge of robbery in the first degree but found them both guilty of the lesser included offense of robbery in the second degree. In response to questioning by the trial court, the jurors acknowledged that the bailiff told them to disregard the documents that had been inadvertently sent to the jury room. However, some of the jurors indicated that they had seen and/or read the unadmitted documents.[2]
Pete moved for a new trial claiming that he was prejudiced by the submission to the jury of the documents that had not been admitted into evidence. The trial court denied the motion concluding that although it was error for the nonadmitted documents to be submitted to the jury, the error was harmless because (1) the documents were only in the jury room for a brief amount of time, (2) the jury was instructed to disregard the documents, and (3) the statements contained in the police report and Pete's written statement were exculpatory in nature.
Division One of the Court of Appeals affirmed Pete's conviction, concluding that there was no reasonable ground to believe that the jury's exposure to the nonadmitted documents prejudiced Pete and that the other evidence presented was more than sufficient to convict Pete of second degree robbery. State v. Pete, No. 50404-5-I, slip op. at 7, 117 Wash.App. 1026, 2003 WL 21387208 (Wash.Ct.App. June 16, 2003). Pete then filed a motion for discretionary review with this court. We granted the petition.

II
Pursuant to CrR 7.5(a)(1), a trial court "may" grant a defendant's motion for a new trial if it "affirmatively appears that a substantial right of the defendant was materially affected" by the jury's receipt of "any evidence, paper, document or book not allowed by the court." A new trial is warranted in such circumstances only when the defendant "`has been so prejudiced that nothing short of a new trial can insure that the defendant will be treated fairly.'" State v. Bourgeois, 133 Wash.2d 389, 406, 945 P.2d 1120 (1997) (quoting State v. Russell, 125 Wash.2d 24, 85, 882 P.2d 747 (1994)). A trial court's denial of a motion for a new trial will not be reversed on appeal unless there is a clear showing of abuse of discretion. Id. An abuse of discretion occurs when no reasonable judge would have reached the same conclusion. Id.
Generally, we are reluctant to inquire into how a jury arrives at its verdict. State v. Balisok, 123 Wash.2d 114, 117, 866 P.2d 631 (1994). There must be a strong, affirmative showing of misconduct in order to overcome the long-standing policy in favor of "stable and certain verdicts and the secret, frank and free discussion of the evidence by the jury." Id. at 118, 866 P.2d 631. It is, however, misconduct for a jury to consider extrinsic evidence and if it does, that may be a basis for a new trial. Id. at 118, 866 P.2d 631." `Novel or extrinsic evidence is defined as information that is outside all the evidence admitted at trial, either orally or by document.'" Id. (quoting Richards v. Overlake Hosp. Med. Ctr., 59 Wash.App. 266, 270, 796 P.2d 737 (1990)). This type of "evidence is improper because it is not subject to objection, cross examination, explanation or rebuttal." Id.
As noted above, the documents that were inadvertently submitted to the jury were the written and signed statement that Pete gave at the precinct station and a written report by the officer who transported Pete to the station. In his written statement, Pete indicated that Olivares-Bahena gave him some beer after which Longtimesleeping walked up to them. Pete went on to state that *807 Olivares-Bahena then handed him the rest of the beer and instructed him to walk away. Pete also said that he did not look back after walking away and was not aware of what Olivares-Bahena and Longtimesleeping "were doing." CP at 33. In the written report, the police officer stated that Pete told him that "he only took some beer, but that the other guy [Longtimesleeping] was the one who actually beat the victim [Olivares-Bahena]." Id. at 32. The officer also said that Pete told him that Olivares-Bahena received his injuries when he fell onto the sidewalk while wrestling with Longtimesleeping.
As noted above, the Court of Appeals held that the trial court did not abuse its discretion in denying Pete's motion for a new trial, concluding that Pete could not demonstrate any prejudice from the inadvertent submission of the two documents to the jury. The State asserts that the Court of Appeals' decision was correct, averring that although the inadvertent submission of the two documents was erroneous, the error was harmless. See Suppl. Br. of Resp't at 13. The State asserts that regardless of the inadvertent submission of the two documents, its case against Pete was "very strong" and the conviction should stand. Id. at 12. In support of its argument, the State points to the fact that: (1) two police officers caught Pete and Longtimesleeping in the act of robbing Olivares-Bahena; (2) Olivares-Bahena immediately made statements corroborating what the two police officers had observed; (3) while Olivares-Bahena's testimony at trial differed from his statements made at the scene, Olivares-Bahena never absolved Pete from wrongdoing; rather Olivares-Bahena testified "he thought the defendants wanted to rob him"; and (4) the two documents that were inadvertently submitted to the jury were exculpatory in nature. Id. at 12. We disagree.
Although two police officers did testify that they saw Pete and Longtimesleeping in the act of robbing Olivares-Bahena, that evidence was refuted somewhat by Olivares-Bahena's testimony at trial that he "gave" beer to Pete and Longtimesleeping so that they would leave him alone.
Furthermore, the two statements that were improperly sent to the jury room are not, as the State contends, entirely exculpatory. Although both statements point to Longtimesleeping as the one who assaulted Olivares-Bahena, they do not absolve Pete from all wrongdoing. Significantly, the transporting officer's report indicates that Pete told the officer that "he only took some beer." CP at 32. This statement may be considered inculpatory because it indicates that Pete participated in taking property from Olivares-Bahena while Olivares-Bahena was being assaulted by Longtimesleeping. In addition, when the two unadmitted statements are viewed together, they are harmful to Pete in the sense that they are contradictory and could suggest to a jury that Pete is a liar who cannot be believed.
While it is undisputed that the jury received evidence that it should not have seen, the critical question that remains is whether the jury's receipt of this evidence prejudiced Pete. Pete's defense throughout the trial was a general denial of participation in any wrongdoing. Although Pete did not testify, he clearly relied on Olivares-Bahena's testimony at trial that Pete did not speak to him or touch him the night of the incident, that Olivares-Bahena voluntarily gave the beer to Pete, and that Olivares-Bahena had problems remembering what actually transpired that night. The submission of the two documents to the jury seriously undermined this defense and nothing short of a new trial can correct the error.[3] We conclude that the introduction of these documents into the sanctity of the jury room did prejudice Pete and that the trial court, therefore, abused its discretion in not granting a new trial.[4]
*808 Lastly, even though the State downplays the trial court error by pointing out that the evidence was deemed admissible during Pete's CrR 3.5 hearing, the fact remains that the documents were not offered or admitted at trial. The jury's receipt of this extrinsic evidence after the close of its evidence presented a "no win" situation for Pete because he was not able to object to or explain the extrinsic evidence. Furthermore, his counsel was unable to cross-examine either the transport officer or the officer who took Pete's statement. The fact that the bailiff instructed the jurors to not consider the extrinsic evidence does not, in our view, mitigate the harmfulness of the error. Even if the trial court had given the instruction, which would be the appropriate practice, the same can be said.

III
The Court of Appeals' decision affirming the trial court's denial for a new trial is reversed and this case is remanded for a new trial.
JOHNSON, MADSEN, SANDERS, IRELAND, and CHAMBERS, JJ., concur.
FAIRHURST, J. (dissenting).
I agree with the majority's presentation of the essential facts of this case and with its exposition of the applicable law, but I dissent from its application of law to fact. I would affirm the trial court and Court of Appeals.
As the majority notes, a trial court may order a new trial under CrR 7.5(a)(1) if evidence improperly provided to the jury causes the defendant to be "`"so prejudiced that nothing short of a new trial can insure that the defendant will be treated fairly."'" Majority at 806 (quoting State v. Bourgeois, 133 Wash.2d 389, 406, 945 P.2d 1120 (1997) (quoting State v. Russell, 125 Wash.2d 24, 85, 882 P.2d 747 (1994))). The majority then asserts that the admissible, but unadmitted, evidence briefly provided to the jury may have prejudiced Laris Pete. According to the majority, Pete's statement "may be considered inculpatory" and the two unadmitted statements "could suggest" that Pete cannot be believed. Majority at 807 (emphasis added).
In my view, the majority's arguments are strained, and I agree instead with the trial court and Court of Appeals' characterization of the evidence as exculpatory and/or harmless. At best, the majority's argument raises only a possibility that Pete was prejudiced by the evidence improperly furnished to the jury. The mere possibility of prejudice, however, is insufficient to require a new trial under CrR 7.5(a)(1). State v. Lemieux, 75 Wash.2d 89, 91, 448 P.2d 943 (1968) ("Something more than a possibility of prejudice must be shown to warrant a new trial."). Requiring a new trial every time a possibility of error arises would amount to a per se rule requiring a new trial every time a jury is improperly presented with evidence. Such a per se rule is not, and should not be, our standard. Instead, the question of whether improperly admitted evidence is so prejudicial that it requires a new trial lies within "the sound discretion of the trial court, who saw both the witnesses and the trial proceedings, and had in mind the evidence." Allyn v. Boe, 87 Wash.App. 722, 730, 943 P.2d 364 (1997); see also Bourgeois, 133 Wash.2d at 406, 945 P.2d 1120.
After noting that the unadmitted statements "may be considered inculpatory" and "could suggest" that Pete is a liar, the majority simply concludes "the introduction of these documents into the sanctity of the jury room did prejudice Pete and that the trial court, therefore, abused its discretion in not granting a new trial." Majority at 807. If this court were standing in the shoes of the trial court, it would be appropriate for us to assess, as the majority does, whether Pete's statements were only partly exculpatory or *809 inculpatory, or whether the two unadmitted statements were so prejudicial that a new trial is warranted. That, however, is not this court's role, and by doing so, the majority replaces the trial court's decision that the unadmitted statements did not require a new trial with its own decision that a new trial is required.
The majority opinion disregards the proper standard of review in this case. Rather than assess whether this court merely agrees or disagrees with the trial court's decision, we must determine whether the trial court's decision represents a clear abuse of discretion. It is well settled that:
The granting or denial of a new trial is a matter primarily within the discretion of the trial court, and the decision will not be disturbed unless there is a "clear abuse of discretion." State v. Bartholomew, 98 Wash.2d 173, 211, 654 P.2d 1170 (1982) (quoting State v. Wilson, 71 Wash.2d 895, 899, 431 P.2d 221 (1967)). An abuse of discretion occurs only "when no reasonable judge would have reached the same conclusion." Sofie v. Fibreboard Corp., 112 Wash.2d 636, 667, 771 P.2d 711, 780 P.2d 260 (1989).
Bourgeois, 133 Wash.2d at 406, 945 P.2d 1120; see also majority at 806.
The majority falls far short of showing that no other reasonable judge could conclude that the jury's brief encounter with two admissible but unadmitted statements (whose exculpatory or inculpatory nature is debatable), does not require a new trial. The majority has not shown that the trial court committed a clear abuse of its discretion when it concluded that a new trial was not necessary. I agree with the Court of Appeals' conclusion that the trial court did not abuse its discretion.
For these reasons, I dissent and would affirm the conclusions reached by both the trial court and Court of Appeals.
OWENS and BRIDGE, JJ., concur.
NOTES
[1] The record does not indicate how much time elapsed between the time the bailiff took the exhibits into the jury room and the time she removed the two inadmissible exhibits from the room. The record only indicates that the bailiff retrieved the exhibits "as soon as she realized" that the mistake occurred. VRP (Mar. 14, 2002) at 68.
[2] The record that has been furnished to us does not contain the questions propounded to the jurors by the trial judge or the answers that they gave to these questions. However, the following colloquy between Longtimesleeping's attorney and the trial court indicates that at least two or three jurors viewed the extrinsic evidence:

"MR. FLORA: Well, your Honor, I don't know if the record is clear that in response to your question [regarding the extrinsic evidence] to the jurors, it looked like virtually all of them nodded their heads yes to the effect 
"THE COURT: I don't know [if] all of them did but some did. More than one. There were at least two or three that I recognized as reacting that way." VRP (Mar. 14, 2002) at 71.
[3] The dissent asserts that "the majority's argument raises only a possibility that Pete was prejudiced by the evidence improperly furnished to the jury." Dissent at 808. We disagree. The dissent discounts the fact that Pete did not testify at trial. The jury's consideration of those documents was tantamount to Pete actually testifying without the opportunity for explanation by his counsel.
[4] The dissent also implies that our decision reversing the Court of Appeals and granting Pete a new trial establishes a "per se rule requiring a new trial every time a jury is improperly presented with evidence." Dissent at 808. We have not endorsed a per se rule by our decision here. We continue to apply the long standing rule that "consideration of any material by a jury not properly admitted as evidence vitiates a verdict when there is a reasonable ground to believe that the defendant may have been prejudiced." State v. Rinkes, 70 Wash.2d 854, 862, 425 P.2d 658 (1967) (emphasis added) (citing State v. Burke, 124 Wash. 632, 215 P. 31 (1923)); see also Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959).