714 S.E.2d 879

**The STATE, Respondent,**

v.

**Jonathan K. HILL, Appellant.**

**No. 4867.**

Court of Appeals of South Carolina.

Heard Feb. 8, 2011.

Decided Aug. 10, 2011.

Rehearing Denied Sept. 22, 2011.

Deputy Chief Appellate Defender Wanda H. Carter, of Columbia, for Appellant.

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, and Assistant Attorney General Mark R. Farthing, Office of the Attorney General, all of Columbia; Solicitor William W. Wilkins, III, of Greenville, for Respondent.

WILLIAMS, J.

Pursuant to *Anders v. California*[1], Jonathan K. Hill (Hill) appeals his convictions for two counts of armed robbery, two counts of conspiracy to commit armed robbery, and one count of resisting arrest.[2] After review, this court ordered the parties to ·brief the issue of whether the circuit court erred in denying Hill's motion for a new trial after the jury mistakenly received two statements made by Hill during deliberations that were not admitted into evidence during trial. We find the circuit court erred and accordingly reverse.

## FACTS

On the evening of January 31, 2002, and the early morning hours of February 1, 2002, the La Quinta Inn and the Hampton Inn (the motels) were both robbed in Greenville County. Hill and his co-conspirators, Damian Taylor (Taylor) and Melvin Warren (Warren), were arrested after fleeing from police pursuit. A grand jury indicted Hill for two counts of armed robbery, two counts of conspiracy to commit armed robbery, and one count of resisting arrest. Taylor and Warren pled guilty and agreed to testify against Hill in exchange for a deal on pending charges.

Hill proceeded to trial from February 3–5, 2003. At a pretrial *Jackson v. Denno*[3] hearing, the State admitted two

1. 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

2. In 1998 or 1999, Jonathan Hill changed his name to Jonathan Green. However, because the initial case caption referred to Appellant as Jonathan Hill, we refer to his former name for purposes of this appeal.

3. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

written statements made by Hill to the Simpsonville Police Department and the Greenville County Sheriff's Office. In his statements, Hill admitted to being a passenger in a Ford Escort (the vehicle) that was used to commit the armed robberies. Hill explained he lived in the same neighborhood as Taylor and Warren and knew they had a reputation for committing robberies. Hill also indicated Taylor and Warren wanted him to ride with them and to "work with them." Hill stated he remained in the vehicle while Taylor and Warren went inside the motels.

The circuit court held Hill's written statements were voluntarily given at the *Jackson v. Denno* hearing. However, the State did not offer Hill's statements into evidence at trial.

The State presented several witnesses during its case-in-chief. Marvin Somarriba, an employee of the La Quinta Inn, testified he heard a "noise at the door" and "two guys running" on the evening of January 31, 2002. Somarriba testified that one of the robbers placed a gun against his head and took $30 and credit cards from his wallet, and that the other robber took approximately $120 from the cash drawer. Furthermore, Somarriba stated the robbers wore dark clothing and dark ski masks.

Rangar Borei, an employee of the Hampton Inn, testified two men wearing dark ski masks and dark clothing entered the Hampton Inn during the early morning hours of February 1, 2002. Borei stated one of the robbers placed a gun against his nose. The robbers took approximately $178 from the cash drawer as well as Borei's wallet, which contained $15, credit cards, and Borei's driver's license and Social Security card.

Officer William Kennedy of the Mauldin Police Department was on patrol when he heard a robbery had occurred over the Simpsonville Police Department's scanner. Subsequently, Officer Kennedy observed the vehicle speeding with its bright headlights on, prompting him to activate his blue lights and follow the vehicle to a Bi–Lo parking lot. Officer Kennedy stated the vehicle did not completely stop, the occupants in the vehicle were "rummaging around," and the occupant in the rear seat of the vehicle appeared to be wearing a red shirt. Shortly after the vehicle entered the parking lot, Officer Kennedy stated the vehicle accelerated "very fast" and made a

left turn onto West Butler Road. At this point, Officer Kennedy pursued the vehicle. During the pursuit, the vehicle "slid off" into a dirt area, and the three occupants exited the vehicle and ran into the woods. Officer Kennedy identified Taylor as the driver of the vehicle and Warren as the front passenger and further indicated that Taylor and Warren were wearing dark clothing.

Officer Brian Lewis of the Mauldin Police Department assisted Officer Kennedy in the police chase. He testified that Taylor, the driver of the vehicle, and the vehicle's front passenger were wearing dark clothing; whereas, the passenger in the rear seat was wearing a red shirt. However, Officer Lewis testified Taylor was wearing black baggy pants and no shirt when he was captured. Officer Harold Harris of the Greenville County Sherriff's Office arrested Warren and testified that Warren had a black ski mask, Borei's wallet, driver's license, and credit cards in his pockets.

In addition, Officer Robert Smith of the Greenville County Sheriff's Office testified his canine tracked Hill to a creek bed. In the process of tracking Hill, Officer Smith discovered a white t-shirt that appeared to be covered in blood, a black tennis shoe, and a New York Yankees hat. Smith noted Hill was wearing a red t-shirt while hiding in the creek bed and that "a wad of unfolded loose cash" was retrieved after Hill was searched. On cross-examination, Officer Smith indicated that Hill did not have a black ski mask in his possession after he was arrested.

Officer Ralph Bobo of the Simpsonville Police Department testified he took photographs of the contents inside the vehicle, which included a black coat and a white shirt located in the rear seat. Officer Bobo also stated that he took photographs of the ski mask and Borei's wallet that were found on Warren after his arrest. Officer Bobby Alexander of the Greenville County Sheriff's Office conducted an inventory search of the vehicle. Officer Alexander noted that a black hooded leather coat, a gray fleece sweatshirt, a football jersey, and a dark colored ski mask were located in the back seat of the vehicle.

Co-conspirators Taylor and Warren testified on behalf of the State. Taylor stated that he drove the vehicle and that

Hill and Warren agreed to ride to a drug area with the intention of robbing a drug dealer; however, they were unsuccessful. At this point, Taylor stated they changed their plans and agreed to go to the La Quinta Inn with the intent of robbing the motel.[4] Taylor testified he remained in the vehicle while Hill and Warren robbed the motels. During cross-examination, Hill questioned Taylor regarding his written police statement in which Taylor indicated that Hill was unaware of the armed robbery plan and thought they were just riding around. Taylor clarified his statement and claimed he told Hill about the robbery plans after Hill entered the vehicle. According to Warren, Hill agreed to participate in the robbing of the motels. Warren stated Hill accompanied him inside both of the motels and participated in the robberies while Taylor remained in the vehicle. Warren also testified he took off his black coat while in the woods and that Hill wore the black coat that was located in the rear seat of the vehicle. On cross-examination, Warren admitted he lied in his police statement when he told the police that he remained in the vehicle while Taylor and Hill robbed the motels. Both Taylor and Warren testified Hill wore a black ski mask and gloves.

After the State's case-in-chief, Hill testified in his own defense. Hill stated he agreed to ride with Taylor and Warren on the belief that they were going to a party and to meet some girls. According to Hill, Taylor parked the car by the La Quinta Inn. Hill stated Taylor and Warren subsequently entered the La Quinta Inn. Soon thereafter, Taylor and Warren returned to the vehicle, and Warren came back with a credit card. After leaving the La Quinta Inn, Hill testified they went to a mall, and Warren unsuccessfully attempted to purchase clothing and jewelry with the credit card stolen from the La Quinta Inn. After leaving the mall, Warren drove to a gas station and purchased gas and beer. Upon leaving the gas station, Hill claimed Taylor parked near a wooden fence and informed him that he and Warren "would be back." Again, Hill asserted he remained in the vehicle and Taylor and Warren returned approximately four to five minutes later. Hill also claimed he did not observe Taylor and Warren with any ski masks or weapons upon exiting the vehicle. During

4. Taylor stated, "[We did] not actually discuss[ ] [robbing the La Quinta], but it was understood by each one of us what was going to go on."

his testimony, Hill averred he did not agree to commit nor have any knowledge of the robbery plans. Hill stated Taylor and Warren threw clothes in the rear seat and he remembered seeing a black coat in the vehicle that belonged to Warren; however, Hill denied observing any ski masks in the rear seat. Hill also indicated that Taylor and Warren did not tell him about the robberies, and he was only aware that the police were pursuing the vehicle. However, Hill acknowledged on cross-examination that he was aware Taylor and Warren had committed robberies in the past, but repeatedly denied having knowledge about their plans to rob the motels.

The jury found Hill guilty of two counts of armed robbery, two counts of conspiracy to commit armed robbery, and one count of resisting arrest. The circuit court sentenced Hill to concurrent sentences of thirty years, five years, and five years, respectively.

After the jury was dismissed and Hill was sentenced, the circuit court judge went into the jury room to speak with the jurors. According to the circuit court judge, the foreman informed him that Hill's written statements were submitted to the jury during deliberations, and the jury considered these statements as important evidence. The circuit court judge questioned the bailiff and was shown the exhibits, which included Hill's two written statements. Soon thereafter, the circuit court informed the parties about the error, and Hill moved for a new trial.

On February 20, 2003, the circuit court conducted a hearing on Hill's motion for a new trial and took the matter under advisement. On June 11, 2003, the circuit court conducted a second hearing on Hill's motion for a new trial. In explaining the inadvertent submission of Hill's statements, the circuit court judge stated, "Apparently what happened is the State's Exhibits that I just referred to got mixed in with the evidence that had been admitted and was submitted back into the jury room not the first day when they deliberated but on the second morning." The circuit court judge orally denied Hill's motion for a new trial during the second hearing and applied a harmless error analysis to consider if the admission of Hill's statements contributed to the guilty verdict. The circuit court concluded the admission of Hill's written statements was

harmless because "[Hill's] [in-court] testimony essentially tracks what's in the statement. There's really not [anything] significant in the statement that wasn't in his testimony." Additionally, the circuit court concluded that it would have admitted Hill's statements into evidence if the State sought to introduce this evidence at trial. The circuit court filed a written order denying Hill's motion for new trial on February 9, 2007.[5]

## STANDARD OF REVIEW

In criminal cases, the appellate court sits to review errors of law only. *State v. Martucci,* 380 S.C. 232, 246, 669 S.E.2d 598, 605–06 (Ct.App.2008). This court is bound by the circuit court's factual findings unless they are clearly erroneous. *State v. Baccus,* 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006). This court does not reevaluate the facts based on its own view of the preponderance of the evidence but simply determines whether the circuit court's ruling is supported by any evidence. *State v. Moore,* 374 S.C. 468, 473–74, 649 S.E.2d 84, 86 (Ct.App.2007).

## LAW/ANALYSIS

Hill contends the circuit court erred in denying his motion for a new trial because the jury considered his written statements during deliberations. Hill alleges the submission of his written statements was prejudicial and improperly influenced the jury because (1) all twelve jurors were exposed to his statements; (2) no curative instructions were given because the error was only discovered after the jury verdict; (3) the weight of the evidence against Hill was not overwhelming; and (4) Hill did not confess to the crime at trial. We agree.

It is well settled that the grant or refusal of a new trial is within the sound discretion of the circuit court. *State v. Taylor,* 348 S.C. 152, 159, 558 S.E.2d 917, 920 (Ct.App.2001).

---

5. Hill filed an application for post-conviction relief (PCR) based on his trial counsel's failure to file a notice of appeal. On April 7, 2005, Judge Larry Patterson conducted a PCR hearing. Judge Patterson denied and dismissed the application without prejudice because Hill had a pending motion for a new trial for which a written order had not yet been filed by the circuit court judge.

Where there is no evidence to support a conviction, an order granting a new trial should be upheld. *State v. Smith*, 316 S.C. 53, 55, 447 S.E.2d 175, 176 (1993). However, where there is competent evidence to sustain the jury's verdict, the circuit court may not substitute its judgment for that of the jury. *State v. Prince*, 316 S.C. 57, 63, 447 S.E.2d 177, 181 (1993)

 The Sixth and Fourteenth Amendments of the United States Constitution guarantee a defendant a fair trial by a panel of impartial and indifferent jurors. *State v. Kelly*, 331 S.C. 132, 141, 502 S.E.2d 99, 104 (1998). In a criminal prosecution, the conduct of the jurors should be free from all extraneous or improper influences. Unless the misconduct affects the jury's impartiality, it is not such misconduct as will affect the verdict. *Id.* Relevant factors a court should consider in determining whether outside influences have affected the jury are the number of jurors exposed, the weight of the evidence properly before the jury, and the likelihood that curative measures were effective in reducing the prejudice. *Id.* at 141–42, 502 S.E.2d at 104.

In *State v. Rogers*, 96 S.C. 350, 80 S.E. 620 (1914), our supreme court confronted a similar factual situation concerning the discovery of the jury's receipt of incompetent evidence after the jury rendered its verdict and was dismissed from service. Rogers was convicted for willful and malicious injury to the cars and engine of the Atlantic Coast Line Railroad Company and endangering the lives of the train's passengers and crew. *Rogers*, 96 S.C. at 351, 80 S.E. at 620. During trial, the State offered an affidavit signed by Rogers' wife. *Id.* Rogers objected to the affidavit, and the trial court sustained the objection finding the affidavit inadmissible. *Id.* at 351–52, 80 S.E. at 620. After all the evidence was presented and the case went to the jury, the trial court inadvertently submitted the affidavit to the jury when he handed the indictment to the foreman. *Id.* at 352, 80 S.E. at 620.

Rogers was convicted and sentenced by the circuit court. *Rogers*, 96 S.C. at 352, 80 S.E. at 620. After the trial court adjourned, the State and Rogers discovered that the inadmissible affidavit was inadvertently submitted to the jury. *Id.* Rogers appealed his conviction. *Id.* On appeal, our supreme court reversed and granted Rogers a new trial. *Id.* at 353, 80

S.E. at 621. In regard to the specific issue relating to the submission of the inadmissible affidavit to the jury during its deliberations, our supreme court stated:

> The affidavit got to the jury after his honor had ruled it incompetent, without any explanation on the part of the court that it was incompetent, and to be disregarded, not denied by the father, who was alleged to have attempted to improperly influence Hattie Rogers' testimony, and unexplained by him or the defendant, and we cannot say that, taken with all of the evidence in the case, it was not prejudicial to the defendant; but, on the contrary, the jury might have arrived at the conclusion that they did by the incompetent testimony, and we have no doubt, if it had been discovered before his honor adjourned the court what had transpired, but that he would have set the verdict aside, and granted a new trial.

*Id.*

In addition to *Rogers*, we note the Washington Supreme Court's opinion in *State v. Pete*, 152 Wash.2d 546, 98 P.3d 803 (2004), also provides guidance on the issue presented in this case. Although not controlling, the Washington Supreme Court addressed the issue of whether a jury's exposure to extrinsic evidence during deliberations warranted a new trial where a police report contradicted the defendant's written statement to the police.

In *Pete*, two Seattle police officers responded to an alleged assault and observed what appeared to be the defendant attempting to take a case of beer from the victim's hand. *Id.* at 804. After the police officers parked their car, they observed the defendant taking the beer from the victim. *Id.* The defendant was subsequently arrested, and the police found two beers in the defendant's pocket and a case of beer close to where the defendant was standing. *Id.* While in transport to the police station, the defendant told an officer that "he only took some beer" from the victim and that the codefendant assaulted the victim. *Pete*, 98 P.3d at 805. After arriving at the police station, the defendant signed a written statement that indicated the victim offered him a beer as the co-defendant arrived. *Id.* The defendant further explained the victim "handed" him the rest of the beer and instructed him to walk

away. *Id.* at 805. At this point, the defendant indicated he walked away from the victim and did not look back to ascertain what the codefendant and the victim "were doing." *Id.* at 805, 807.

At a pre-trial hearing, the trial court held the police officer's report, which contained the defendant's oral statement that "he only took some beer," and the defendant's written statement that the victim offered him a beer and "handed" him the rest of the beer were admissible. *Pete,* 98 P.3d at 805. However, the police report and the defendant's written statement were not introduced into evidence at trial. *Id.*

After the jury reached a verdict, but before the verdict was rendered, the trial court informed the parties the police report and the defendant's written statement were mistakenly sent to the jury room. *Pete,* 98 P.3d at 805. After this discovery, the bailiff retrieved the officer's statement and "grabbed" a second document. *Id.* However, the second document had been properly admitted into evidence. *Id.* Upon this discovery, the bailiff returned the second document, retrieved the other piece of unadmitted evidence, and instructed the jury to disregard the police report and the defendant's written statement. *Id.* After the trial court explained the course of events, the State and the defendant both agreed the verdict should be received and the jury should be polled about their knowledge concerning the police report and the defendant's written statements. *Id.* at 805.

During polling, the jurors indicated the bailiff told them to disregard the police report and the defendant's written statement. *Pete,* 98 P.3d at 806. Nonetheless, some members of the jury panel stated they saw and/or read the police report and the defendant's written statement. *Id.* The defendant was convicted of second-degree robbery. *Id.*

The defendant made a motion for a new trial and argued the mistaken submission of the police report and his written statement to the jury was prejudicial. *Pete,* 98 P.3d at 806. The trial court denied the motion and held the error was harmless because the documents were in the jury room for a brief period of time, the jury was instructed to disregard the documents, and the statements in the police report and the written statement were exculpatory. *Id.* Division One of the

Washington Court of Appeals affirmed and held there was no reasonable ground to believe that the defendant was prejudiced by the nonadmitted documents and the evidence presented at trial was sufficient to sustain the conviction. *State v. Pete*, No. 50404–5–I, 2003 WL 21387208, at * 3 (Wash.Ct. App. June 16, 2003).

On appeal, the Washington Supreme Court reversed the court of appeals' decision and granted the defendant's motion for a new trial. *Pete*, 98 P.3d at 807. The State argued the inadvertent submission of the police report and the defendant's written statement to the jury was harmless error because the evidence was "very strong" to sustain the conviction. *Id.* Namely, the State argued (1) two police officers caught the defendant and the co-defendant robbing the victim; (2) the victim's statements corroborated the police officers' observations; (3) the victim's inconsistent statement at the scene compared to his in court testimony did not absolve the defendant from any criminal activity because the victim stated "he thought [the defendant and co-defendant] wanted to rob him;" and (4) the police report and the defendant's written statement were exculpatory in nature. *Id.*

In reversing the court of appeals' decision, the Washington Supreme Court noted the police officers' testimony regarding their observations that the defendant and co-defendant were in the act of robbing the victim was to some extent refuted. *Pete*, 98 P.3d at 807. At trial, the victim testified he "gave" beer to the defendant and the co-defendant so they would leave him alone. *Id.* Moreover, the court concluded the police report was not completely exculpatory because the defendant informed the officer that "he only took some beer." *Id.* This statement, according to the court, "may be considered inculpatory because it indicates that the defendant participated in taking property from [the victim] while [the victim] was being assaulted by [co-defendant]." *Id.* Additionally, the court further stated, "[W]hen the two unadmitted statements are viewed together, they are harmful to [the defendant] in the sense that they are contradictory and could suggest to a jury that [the defendant] is a liar who cannot be believed." *Id.*

In analyzing whether the defendant was prejudiced by the inadvertent submission of the police report and his written

statements, the court noted (1) the defendant denied any wrongdoing; (2) the defendant did not testify and instead relied on the victim's testimony that the defendant did not speak or touch the victim, and the victim voluntarily gave beer to the defendant; and (3) the victim had problems remembering the events on the night in question. *Pete*, 98 P.3d at 807. Based on the facts of the case, the court concluded the submission of the police report and the defendant's written statement "seriously undermined [the defendant's] defense and nothing short of a new trial can correct the error." *Id.*

Furthermore, the Washington Supreme Court observed that even though the evidence was deemed admissible at a pre-trial hearing, the State did not offer or admit the evidence at trial. *Pete*, 98 P.3d at 808. The court pronounced:

The jury's receipt of this extrinsic evidence after the close of its evidence presented a "no win" situation for [the defendant] because he was not able to object to or explain the extrinsic evidence. Furthermore, his counsel was unable to cross-examine either the transport officer or the officer who took [the defendant's] statement. The fact that the bailiff instructed the jurors to not consider the extrinsic evidence does not, in our view, mitigate the harmfulness of the error. Even if the trial court had given the instruction, which would be the appropriate practice, the same can be said.

*Id.*

In the present case, we conclude the improper submission of Hill's two written statements to the jury is reversible error. Although the circuit court ruled Hill's written statements were voluntarily given, the State did not introduce Hill's statements into evidence at trial. Thus, the entire jury panel was exposed to evidence that had not been admitted during trial, thereby unduly prejudicing Hill.

Nevertheless, the State contends despite any error in the inadvertent submission of Hill's statements, such error is harmless based on the evidence presented at trial. In support of its argument that the admission of Hill's written statements was harmless error, the State argues (1) Taylor and Warren's testimony indicated that Hill actively participated in the commission of the armed robberies; (2) Hill was seen in the back seat of the fleeing vehicle after an officer attempted to stop

the vehicle; (3) officers found a ski mask along with a black coat linked to Hill; and (4) Hill fled from the police and was discovered hiding in a creek bed. We disagree.

Whether an error is harmless depends on the circumstances of the particular case. *State v. Wiley*, 387 S.C. 490, 497, 692 S.E.2d 560, 564 (Ct.App.2010). No definite rule of law governs this finding; rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case. *Id.* Error is harmless when it "could not reasonably have affected the result of the trial." *Id.* "When guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached, [an appellate] court should not set aside a conviction because of errors not affecting the result[ ]." *State v. Kirton*, 381 S.C. 7, 25, 671 S.E.2d 107, 115–16 (Ct.App.2008) (citation omitted).

A comparison of Hill's trial testimony and Hill's written statements implicates Taylor and Warren's direct involvement in the commission of the robberies of the motels and that Hill remained in the vehicle. Specifically, Hill's written statement given to the Simpsonville Police Department provides in pertinent part:

I know [Taylor and Warren] have been jacking (robbing) people or places. I have heard they have robbed the Motel 6 where [Warren's] girlfriend works there. [Warren] had a .380 pistol. [Taylor and Warren] said it was stolen. They have tried to get me to ride with them before. About nine p.m. [Taylor] and [Warren] came to my girlfriend's house. *They wanted me to go ride with them. They said if I wanted to go to work to work with them* .... We went to the La Quinta Inn and [Warren] went to some white boys and bought a beer. They let them in the side door. Both [Taylor] and [Warren] robbed the motel and we left and went to a mall.... [Warren] attempted to use a credit card that was taken and it did not work. We left in a white car. I thought we were going home. We drove to Simpsonville and stopped at the gas station.... We parked in a white motel near the Hampton Inn. [Warren] and [Taylor] got out of the car and went around a gate and went into the Hampton Inn. They later came back and [Warren] said that he had went back and got him. This meaning [Warren] had went back behind the counter and robbed the clerk. [War-

ren] had the billfold which was taken from the clerk at the Hampton Inn. [Taylor] was driving away. Then the police got behind us. He pulled over [to] stop[ ] briefly. Then [Taylor] pulled onto the road again. We later went off the road and I was later arrested by the police. I am sorry that these places were robbed.

(emphasis added).

Hill's statement to the Greenville County Sheriff's Office provides in pertinent part:

I have decided that I wanted to clear all this up and get everything in the open. I told [Officer] Bobo about how I was involved in the robbery at the Hampton Inn and who I was with. I also told him about a robbery at the La Quinta Inn on 85. . . . [Warren] and [Taylor] are involved with some other people who are going around catching likcs (sic) on people. Catching licks means robbing people or stealing something. Anything to come up with money quick. Lately [Warren] and [Taylor] have been robbing motels and that's who [I] was with when the Hampton Inn got robbed. Before we went to the Hampton Inn we went to the La Quinta Inn. . . . I was sitting in the back seat of the car we were in. It was a white Ford Escort. [Warren] got out of the car and he walked up on a group of white guys in the parking lot. [Warren] walked back to the car and said let me get a dollar so he could buy a beer from one of the white guys. [Warren] walked back over and one of the white dudes opened the back door, like on the end of the hallway, and let them in. [Warren] went in with the white guys and came back a few minutes later and got [Taylor] and [Warren and Taylor] went back into the motel. [Warren] and [Taylor] were in there not even five minutes and they came running to the car. I didn't see no money or gun but they had a wallet. [Warren] said we got to go to the mall, we got to go to the mall. We went over to Haywood Mall. We went to a store upstairs. It was a clothing store. [Warren] tried to buy a hooded sweatshirt with a credit card out of the wallet, but it was declined. Then we went over to a jewelry stand and [Warren] tried to buy something there. I walked off and [Taylor] came over there by me. I was saying that they were getting greedy and stop being greedy. [Warren] couldn't buy anything at the jewelry store. . . . They went to

the Hampton Inn in Simpsonville and hit it and we ran. . . . This group that is hitting things is mainly [Warren] and [Taylor] and whoever they could get to go with them.

Hill's statement to the Simpsonville Police Department reveals his knowledge that Taylor and Warren wanted him to "ride with them" and to "work with them." This phrase, in conjunction with the context of Hill's statement to the Simpsonville Police Department, indicates that Taylor and Warren wanted Hill to ride with them to participate in an armed robbery. However, at trial, Hill testified he was unaware of any robbery plans and explicitly denied any involvement in the robberies. In fact, Hill specifically stated he rode with Taylor and Warren on the belief that they were going to a party and going to meet some girls.

When viewed together, Hill's statement to the Simpsonville Police Department and his trial testimony are contradictory and undermine Hill's credibility to the jury. Because Hill's credibility was impermissibly impugned by evidence not admitted at trial, this contradiction strongly suggested to the jury that Hill was untruthful during his testimony and could not be believed. Due to the gravity of this error, we conclude Hill's entire defense was prejudiced because his credibility was substantially damaged. *See State v. Outlaw*, 307 S.C. 177, 180, 414 S.E.2d 147, 148 (1992) ("[E]rror which substantially damages the defendant's credibility cannot be held harmless where such credibility is essential to his defense.") (citation omitted); *see also Pete*, 98 P.3d at 807 (noting the inadvertent submission of *contradictory evidence not admitted at trial suggested to the jury that defendant was a liar* ).

Additionally, unlike many South Carolina cases in which a circuit court may issue a curative instruction to cure the prejudicial effect of the jury's consideration of extrinsic evidence, the circuit court was unable to issue a curative instruction due to the timeframe when the error was discovered. Moreover, this error was furthered compounded because the foreman of the jury informed the circuit court that the jury considered Hill's statements to be important evidence. Nevertheless, we note the holding in *Rogers* provides guidance on the appropriate remedy. *See Rogers*, 96 S.C. at 353, 80 S.E. at 621 (noting the jury's receipt of incompetent evidence

without a curative instruction could have caused the jury to rely on the improper testimony in reaching its conclusion and thus a new trial was the appropriate remedy). Under the circumstances of this case, the absence of a curative instruction, in conjunction with the jury's belief that Hill's statements were considered important evidence, precludes us from being able to unequivocally ascertain whether the jury's verdict rested on the evidence presented at trial or whether the verdict was improperly affected by Hill's written statements. *See State v. White,* 371 S.C. 439, 445, 639 S.E.2d 160, 163 (Ct.App.2006) ("A curative instruction to disregard incompetent evidence and not to consider it during deliberation is deemed to have cured any alleged error in its admission.") (citation omitted); *see also State v. Reese,* 370 S.C. 31, 38, 633 S.E.2d 898, 901 (2006) ("Jurors are sworn to be governed by the evidence, and it is their duty to consider the facts of the case impartially.") *overruled on other grounds by State v. Belcher,* 385 S.C. 597, 685 S.E.2d 802 (2009).

Finally, at the second motion for a new trial hearing on June 11, 2003, the circuit court judge indicated that it would have admitted Hill's written statements at trial. However, the written statements were solely admitted into evidence for purposes of the *Jackson v. Denno* hearing. Because the written statements were not admitted at trial, and the jury was exposed to Hill's written statements during its deliberations, Hill was denied the opportunity to object to or explain his written statements. *See Pete,* 98 P.3d at 808 (noting defendant was not able to object to or explain the extrinsic evidence when the jury received the evidence after the close of evidence). Additionally, Hill was unable to cross-examine Officer Bobo and Officer Smith regarding his written statements.[6] *Pete,* 98 P.3d at 808 (finding defendant was denied the right to cross-examination when the jury received extrinsic evidence after the close of all the evidence). Based on the foregoing, we conclude the circuit court abused its discretion

---

6. Officer Wes Smith of the Greenville County Sheriff's Office took Hill's written statement and testified at the *Jackson v. Denno* hearing. However, Officer Smith did not testify at trial. Officer Bobo's testimony was limited to his actions in taking photographs at the scene where Hill, Taylor, and Warren were arrested in the early morning hours of February 1, 2002.

in denying Hill's motion for a new trial as to his convictions for armed robbery and conspiracy to commit armed robbery.

## CONCLUSION

Accordingly, the circuit court's decision is

**REVERSED and REMANDED.**

GEATHERS and LOCKEMY, JJ., concur.