[Nos. 38452, 38446, 38441.   Department Two.   March 23, 1967.]

THE STATE OF WASHINGTON, *Respondent*, v. RICHARD ALLEN RINKES, *Appellant.*

THE STATE OF WASHINGTON, *Respondent*, v. GERALD HERBERT BARNETT, *Appellant.*

THE STATE OF WASHINGTON, *Respondent*, v. MITCHELL THOMPSON, *Appellant.**

*Reported in 425 P.2d 658.

*James Gooding* (of *Reaugh, Hart, Allison, Mortimer & Prescott*), for appellant Rinkes and Thompson (Appointed counsel for appeal).

*Irving C. Paul, Jr.,* for appellant Barnett (Appointed counsel for appeal).

*Charles O. Carroll* and *Larry L. Barokas,* for respondent.

FINLEY, C. J.—This is a consolidated appeal on an agreed statement of facts. The three defendant-appellants were tried together and convicted of grand larceny by possession of stolen plumbing supplies. Each was sentenced to a maximum of 15 years in the penitentiary. Defendants Rinkes and Thompson make three assignments of error. The first two relate to an allegedly prejudicial comment, not supported by the evidence, made by the prosecutor in his opening statement, and to the admission of evidence purportedly obtained in violation of defendant Thompson's Fourth Amendment rights. The only assignment of error made by defendant Barnett is the same as the third assignment of error made by Rinkes and Thompson. It involves consideration by the jury of an allegedly prejudicial newspaper editorial with accompanying cartoon which was accidently sent to the jury room.

At the trial, the defendants moved to suppress all physical evidence taken from them at the time of arrest, any statements given to the police at that time and any visual evidence which was made available to the police when they looked through apertures in the warehouse at which the defendants were arrested. The motion, which was denied

by the trial court, was based on the following background facts.

One DeVore, who was leasing a warehouse from a man named Riddle, was behind in his rent, and they agreed that each would look for a subtenant. DeVore gave Riddle a set of keys so that Riddle could show the premises. DeVore and defendant Thompson thereafter agreed that Thompson would rent a portion of the warehouse for a week to 10 days to store equipment. DeVore told Thompson that Riddle and some brokers would continue to try to rent the premises during Thompson's occupancy. On April 6, 1965, Riddle came to the warehouse for the purpose of showing it to a prospective subtenant. On entering, Riddle saw boxes labeled "Bowles Northwest", which were apparently visible from all portions of the warehouse. He remembered reading about a burglary of Bowles Northwest and called the police. A detective responded, and Riddle took him into the warehouse and showed him the boxes. The building was then placed under police surveillance from a school across the street until April 11, 1965, when the defendants were arrested, Rinkes and Barnett in the building and Thompson outside. During the surveillance, the police entered the warehouse and looked inside the Bowles Northwest boxes.

■ We find no violation of the Fourth Amendment which is of any assistance to the defendants. Thompson did not at any time have exclusive possession of the demised warehouse. He rented only a portion of the building for a short period of time, and he agreed and understood that other people, including Riddle, would be entering and leaving the premises. Riddle observed the Bowles Northwest boxes from an area not leased to Thompson. This occurred while Riddle was legitimately present for the purpose of showing the warehouse to a prospective subtenant. The detective who came to the scene at Riddle's invitation thus also legally entered and observed the boxes. When an officer is lawfully invited to enter, it would seem to be logically rather clear that there is no illegal entry, and the officer is able legally to observe that which is obvious, *State v. Reed,*

56 Wn.2d 668, 354 P.2d 935 (1960), *aff'd. sub nom. Reed v. Rhay*, 323 F.2d 498 (9th Cir. 1963), *cert. denied*, 377 U.S. 917 (1964).

■ It was after the detective saw the boxes that the warehouse was placed under surveillance from a school across the street. Defendants Rinkes and Thompson complain that no search warrant was obtained during the 5 days that the building was under surveillance. It is clear, however, that none was necessary merely to maintain police surveillance from across the street. As a matter of fact, no search warrant was obtained because no search was necessary nor would it have served a useful purpose at that point; the police already had the information that a large number of Bowles Northwest boxes, matching those stolen were in the warehouse, and they could have obtained no further information as to the identity of the perpetrators of the theft had they conducted a search. The entrance of the warehouse and the examination of a few of the boxes by police officers during the surveillance was thus futile and fruitless in a legal sense. Since there is no indication that any evidence was thus obtained, the defendants have no basis for objection. See *Burke v. United States*, 328 F.2d 399 (1st Cir. 1964). That is to say, certainly the defendants were no more prejudiced than by the first, entirely legal observation of the boxes by Riddle and the detective which eventually resulted in their arrest.

■ When the defendants did appear at the back of the warehouse on April 11, 1965, and began to load the stolen goods on a truck in the presence of police, the officers had probable cause to believe that a felony had been or was being committed. The consequent arrest was lawful. *State v. Nolan*, 69 Wn.2d 961, 421 P.2d 679 (1966); *State v. Brooks*, 57 Wn.2d 422, 357 P.2d 735 (1960). The acquisition and seizure of evidence later used at trial was incident to a lawful arrest, and thus the evidence was properly admitted. *State v. Schwartzenberger*, ante p. 103, 422 P.2d 323 (1966); *State v. Smith*, 56 Wn.2d 368, 353 P.2d 155 (1960).

Defendants Rinkes and Thompson cite *State v. Riggins*,

64 Wn.2d 881, 395 P.2d 85 (1964), and *State v. Michaels*, 60 Wn.2d 638, 374 P.2d 989 (1962), in support of their position on the Fourth Amendment issue. Neither of these cases is apposite. Both involved illegal searches productive of evidence admitted at trial. We find no merit to the defendants' Fourth Amendment argument.

In his opening statement, the deputy prosecuting attorney told the jury that Jeanne Nicholson, alleged to be the girl friend of defendant Barnett, would testify that, sometime after the burglary of Bowles Northwest, she saw defendant Barnett burning labels which read "Bowles Northwest." The jury was also told that Miss Nicholson would implicate all three defendants in the crime. No objection was made to the opening statement. When Miss Nicholson was called, she relied upon the Fifth Amendment, refused to testify, and her refusal was upheld by the trial court. No motion was made to strike the opening statement nor was there a motion for a mistrial or for cautionary instructions. The state made an offer of proof as to the testimony anticipated from Miss Nicholson. This was based upon her statements to police officers.

First it should be stated that we are convinced the prosecutor's remarks were made in good faith. Miss Nicholson had made a statement to Seattle police officers which substantiated the comments made by the prosecutor. During the trial, when Miss Nicholson was called to the stand, counsel for defendants Rinkes and Thompson asked the court's permission to interview the witness in private. After a recess, during which time she was interviewed by defense counsel, the witness returned to the courtroom with her attorney, who theretofore had not been in the courtroom. At this point, Miss Nicholson claimed the privilege of the Fifth Amendment and refused to testify. The state made the aforementioned offer of proof out of the presence of the jury, and no further questioning of Miss Nicholson occurred in the presence of the jury. There is

every indication that the prosecutor was genuinely surprised by Miss Nicholson's refusal to testify and that he intended no misconduct. We note further that the dubious comment now questioned here was made in the opening statement, when pertinent testimony was reasonably anticipated, rather than in the closing statement after all the available evidence had been presented.

If we were to decide the problem presented by defendants it would be significant, of course, that the defendants failed to preserve any rights which they might have had by moving to strike the offending portion of the opening statement and by requesting that the jury be instructed to disregard it, or possibly by moving for a mistrial when Miss Nicholson raised the Fifth Amendment. The general rule is that one cannot voluntarily elect to submit his case to the jury and then, after an adverse verdict, claim error which, if it did exist, could have been cured or otherwise ameliorated by some action on the part of the trial court. *State v. Perry*, 24 Wn.2d 764, 167 P.2d 173 (1946). The only exception to this rule is in the case of remarks or misconduct so obviously prejudicial or flagrant that an instruction could not have cured the inflammatory effect. *Nelson v. Martinson*, 52 Wn.2d 684, 328 P.2d 703 (1958); *State v. Perry, supra.* The instant case does not thus qualify, in our judgment, particularly in view of the instructions given to the jury, that the statements of counsel are not evidence and that only the evidence admitted in the trial is to be considered.

The three convictions involved must be reversed for another reason, so it is actually unnecessary to reach a decision on this assignment of error. The error, if any, is unlikely to reoccur at a subsequent trial of the same cause.

The third issue raised, which is dispositive of this appeal, involves a newspaper editorial and cartoon which went to the jury. The jury in the instant case was empaneled on

June 16, 1965, and permitted to go home that night. The following morning, June 17, 1965, an editorial and cartoon appeared in the Seattle Post-Intelligencer which were most critical of supposedly lenient court decisions in criminal actions, and criticized certain allegedly liberal probation policies of some of the judges of the King County Superior Court. The cartoon and editorial are reproduced below.

## 'Gentlemen, Prepare Your Weapons!'

# Lenient Court Decisions
# Threatening Your Security

LAST WEEK the King County prosecutor felt impelled to go before the Superior Court to recommend leniency for an elderly woman who admittedly had embezzled nearly $40,000 from her employers to hand over to a male friend.

The prosecutor's reasoning was this: he found it inconsistent to send an aged woman to prison for stealing, considering that so many who have robbed at the point of a gun have been allowed to go free on probation.

His point was well taken. By and large the local bench has developed an amazingly tolerant pattern in the handling of what used to be considered grave crimes.

Granting probation for armed robbery, once unheard of, has become commonplace.

Within one month before the elderly woman came up for sentencing three robbers had received probation from the courts.

AMONG OTHERS who had received probation for robbery before them was a nineteen year old who confessed three filling station robberies in which he took along a fifteen year old helper. Another had held up a restaurant and left three employees bound with tape. Still another held up a food market and then a delicatessen at the point of a rifle. An ex-reformatory inmate from Ohio abducted a housewife in her own automobile and robbed her.

All these criminals were granted probation.

This is a dangerous pattern which feeds upon itself. Probations for serious crimes create precedent for further probations.

Let's look at this curiously soft-hearted record further.

Probation has been granted to dozens of death drivers. It was granted to a man who knocked down two women with his fists because he was brooding about an unhappy first marriage.

Probation was given to a man who pleaded guilty to wiring a bathtub in which his wife received a near-fatal shock. Leniency was shown also to a man who shot in the back a process server who had served him with divorce papers. A 23-year-old burglar was given probation although he had already served two prison terms and was on parole when he committed his third known crime.

In all but one of these cases the prosecutor recommended prison terms. But the courts saw fit to make it probation instead.

THE LIST SEEMS endless, and it grows by the week. In one day seven men and a woman were brought before a judge for sentencing for various crimes: robbery, burglary, misappropriation of funds.

Not one of the eight went to prison.

The record further shows that long criminal records are no bar to probation. One such was up for a narcotics rap. He got probation, and the judge even got down off the bench to shake his hand. Within a year the criminal was back at the rail for participating in $20,000 worth of burglaries.

We could go on with the sorry, incredible record, but this gives you an idea.

The bench and bar might well contemplate what this crystallizing pattern does to the morale of police officers.

They might well consider what it does to encourage others to crime.

They might well think of the inherent dangers in this mounting record of probations.

"The quality of mercy is not strained," the poet said. "It droppeth as a gentle rain from Heaven."

Maybe so. But the bench of this region is certainly straining itself as to mercy, and probations are no gentle rain. They have become a downpour which threatens torrential damage to the peace and security of Seattle and the county.

All three defendants moved for a change of venue or in the alternative for a continuance on the grounds that the jury members, who might have had access to the newspaper in question, would be prejudiced by reading this material. The editorial and cartoon, marked "Defendants Exhibit One," were offered to the court solely for purposes of the motion and out of the jury's presence. Through inadvertence, this material went into the jury room with the other exhibits.

The prosecuting attorney subsequently stated in an affidavit that he had contacted three members of the jury who stated that they were not influenced in their deliberations by the editorial. Such a hearsay affidavit by counsel cannot be used to impeach a jury verdict. *Cox v. Charles Wright Academy, ante* p. 173, 422 P.2d 515 (1967). For similar reasons, a verdict cannot be sustained by such an affidavit. *State v. Burke,* 124 Wash. 632, 215 Pac. 31 (1923). The situation would be no different if the affidavits were those of the jurors themselves. *State v. Adamo,* 128 Wash. 419, 223 Pac. 9 (1924).

The newspaper material clearly should not have gone to the jury room. This court has stated that consideration of any material by a jury not properly admitted as evidence vitiates a verdict when there is a reasonable ground to believe that the defendant may have been prejudiced. *State v. Burke, supra.* See also *State v. Boggs,* 33 Wn.2d 921, 207 P.2d 743 (1949), and *Marshall v. United States,* 360 U.S. 310 (1959). In McCarthy, *Fair Trial and Prejudicial Publicity: A Need for Reform,* 17 Hasting L.J. 79 (1965), the author comments with approval on the *Marshall* holding that consideration by jury members of any material, the admission of which at trial would be reversible error, is inherently prejudicial.

Here we have a case where not just the character of the defendant was attacked, but rather the alleged leniency of the judicial process in regard to criminals. The material published in the newspaper was clearly intended to influence the readers of it to be concerned about the pur-

ported leniency to alleged criminals of Seattle area judges. It was so calculated that it may well have evoked in jury members feelings or convictions of the necessity for being stricter and less careful about observing legal principles and procedure in dealing with defendants accused of crime. We think the material was very likely indeed to prejudice the cause of the defendants in this case. We cannot accept the state's argument that, since the material was marked as a defense exhibit, it would therefore, as a matter of course, be considered in the light most favorable to the defendants. Nor do we agree that defense counsel had a duty to check the exhibits before they went to the jury in view of the existing practice to the contrary.

We are convinced that the defendants were unable to meet or cope with the prejudicial effect of the material. The jury had no guidelines or specific instructions regarding it. Under the circumstances, we will not speculate at great risk to the defendants. We feel compelled to assume that the requisite balance of impartiality was upset. We note particularly that this is not a case, such as *State v. Adamo*, 128 Wash. 419, 223 Pac. 9 (1924), where the jury was instructed not to consider the extraneous newspaper material, and could be presumed not to have done so, since it was a matter outside the evidence. Nor do we have a case, such as *State v. Harris*, 62 Wn.2d 858, 385 P.2d 18 (1963), where interrogation of the jury by the trial court established that no jury member had read the questionable portion of a newspaper article which was found in the jury room. In the instant case, the jury was in effect instructed to consider the very likely prejudicial material since it was marked as an exhibit and they were specifically instructed to consider all the exhibits. We can only presume that the members of the jury did as they were instructed.

The convictions should be reversed and the case remanded for a new trial free from potential taint, by the extraneous material inadvertently before the jury in this case. It is so ordered.

WEAVER, ROSELLINI, and HAMILTON, JJ., and BARNETT, J. Pro Tem., concur.

May 29, 1967. Petition for rehearing denied.