2013 JUL -8 A.II: 10


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 67746-2-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| WARREN MILTON RICHARDSON II, | ) | UNPUBLISHED OPINION |
| a/k/a WARREN MILTON RICHARDSON | ) | |
| | ) | |
| Appellant. | ) | FILED: July 8, 2013 |
| | ) | |

LAU, J. — Warren Richardson appeals two first degree robbery convictions. He contends that (1) under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the trial court should have suppressed a statement police recorded while he was a patient in the hospital, (2) he was denied a fair trial because the trial court mistakenly provided his unredacted statement to the jury during deliberations, and (3) the trial court erred in refusing to impose an exceptional sentence below the standard range. We find no trial court error in the admission of Richardson's redacted statement. But because reasonable grounds exist to believe Richardson may have

been prejudiced by the jury's receipt of his unredacted statement, we reverse and remand for a new trial.

## FACTS

### Sterling Savings Bank Robbery

On November 6, 2009, a man robbed the North Bend Sterling Savings Bank. He approached bank teller Christine McCartney and told her, "I'm here to rob you." Report of Proceedings (RP) (July 12, 2011) at 185. McCartney asked him if he was kidding. The man demanded money. McCartney was nervous and had trouble opening her drawer. The man said, "Don't make me get my gun out." RP (July 12, 2011) at 186, 200-01. McCartney thought he appeared slightly intoxicated, but his voice was serious and firm. She observed no slurred speech.

McCartney placed some small denomination bills on the counter. The man asked for more money. She responded that it was late in the day on a Friday and that was all she had left. The man took the money and walked out quickly and deliberately. McCartney described the man to police as approximately 55 years old, with gray hair and a stubbly beard.

Personal banker Mary Fairbrook activated the bank's silent alarm when she saw McCartney and the bank robber. Fairbrook described the man to police as a "well-weathered" white male, about 50 years old, with shoulder length gray hair under his hat. RP (July 12, 2011) at 227.

### Frontier Bank Robbery

Three days later, a man in his 50s or early 60s walked into the Frontier Bank in Ballard. As bank teller Krisna Mohler greeted the man, she grew nervous because he

-2-

was intensely focused on getting close to her teller's window. At her window, he said, "[G]ive me all your tens, twenties, and all your money." RP (July 13, 2011) at 290.

Bank branch manager Tamara Berft noticed the man walk in. She saw white tape on his fingers and instinctively knew something was wrong. Berft walked behind the teller window to assist Mohler.

Mohler mouthed the word "robbery" to Berft, and Berft triggered the bank's silent alarm. Mohler gave the man money from her drawer. She also gave him her "alarm bill," which triggered another silent alarm. She also gave the man a dye pack—an explosive device made to look like a pack of bills that emits dye, smoke, and pepper spray when removed from the bank. Mohler also noticed white electrical-style tape covering each of his fingertips. The man took the money, walked briskly out of the bank, and ran through the parking lot. Mohler testified that the man appeared determined, focused, and goal oriented. She noted no coordination problems or slurred speech. When the man ran through the parking lot, another bank employee saw the dye pack explode.[1]

Investigation

King County Sheriff Detective Mike Mellis investigated the North Bend robbery. He obtained copies of surveillance images from Sterling Savings Bank, but the images were not very clear. Detective Mellis forwarded the case information to the FBI's bank robbery task force. A few days later, a task force member responded that a robbery also occurred at the Ballard Frontier Bank. He noted that the Ballard suspect

---

[1] At trial, Mohler and Berft identified Richardson in the courtroom as the man who robbed the Frontier Bank.

resembled the North Bend suspect. The Ballard Frontier Bank robbery surveillance video images recorded the robber's face clearly. Detective Mellis distributed still photographs from the Ballard robbery to the North Bend police and to a local North Bend newspaper. On November 15, 2009, John Provo flagged down King County Sheriff Deputy Robert Henry in a North Bend parking lot. Provo told Deputy Henry that he saw the bank surveillance photographs in the local paper and recognized the bank robber as Warren Richardson. Provo said he sold Richardson a motor home several months earlier. Provo also said he received a phone call from Richardson's son, Harold, that morning. Provo told Deputy Henry about Richardson's current location. Deputy Henry gave that information to Detective Mellis.

Detective Mellis learned that Richardson was in the intensive care unit (ICU) at Harborview Medical Center. He visited Richardson to see if he resembled the individual in the bank surveillance images. Detective Mellis arrived at Harborview around 8 AM on November 16. A nurse directed him to Richardson's room and told him that Richardson was awake and alert.

Harborview security officer Craig Compton accompanied Detective Mellis to Richardson's room and stood in the hall while Mellis first made contact with Richardson. Detective Mellis wore plain clothes, "probably . . . slacks and some kind of a jacket to . . . hide [his] badge and gun and all those things in a public environment." RP (July 7, 2011) at 64. Officer Compton was in uniform. When Detective Mellis entered the room, Richardson was in bed either sleeping or resting. Richardson had intravenous and other electronic monitoring devices attached to him. He immediately responded

when Detective Mellis entered the room and said hello. Detective Mellis noted Richardson's close resemblance to the robber in the surveillance images.

Detective Mellis came up with a "ruse" to see Richardson's reaction. He told Richardson that the investigation was over, he knew Richardson was the robber, and he wanted to ask Richardson about the crimes. Richardson paused for a moment and then admitted he had robbed two banks, one in North Bend and one in "north Seattle somewhere." RP (July 14, 2011) at 407. Richardson spoke briefly to Detective Mellis about the stress in his life at the time he committed the robberies. When Detective Mellis asked Richardson to record his statement, Richardson agreed.[2]

Detective Mellis called Officer Compton into the room as a witness to the recorded statement. Detective Mellis turned the recorder on and read Richardson his Miranda rights. Detective Mellis told Richardson that normally he would inform him that he was free to walk away from the conversation, "But since we're in a hospital and you're laying here, I'm gonna read you your rights anyways." Ex. 31 at 1. Detective Mellis explained to Richardson:

> [A] lot of people think it's black and white. Either they talk to the cops or they don't talk to the cops. But the truth is right there, number six. It's, it's up to you when you talk and when you don't talk. You can start talking, stop talking. It's up to you. Do you understand?

Ex. 31 at 2-3. Richardson agreed to waive his rights and give a recorded statement.

Throughout the recorded conversation, Detective Mellis evaluated Richardson's alertness, specifically checking to see if Richardson was staying awake, making eye

---

[2] This initial conversation, including the "ruse," was not recorded. Because Officer Compton was standing outside the room, Detective Mellis's testimony is the only evidence in the record regarding what was said during this initial contact. The initial interview lasted "a few minutes." RP (July 12, 2011) at 266.

contact, paying attention, and understanding the conversation. Detective Mellis determined that Richardson was communicative, responsive, and that his answers made sense. Officer Compton similarly testified that Richardson had no trouble making eye contact and his answers were coherent and responsive. At one point during the interview, Officer Compton was called away to respond to an incident elsewhere in the hospital. He was not present for the remainder of the interview.

During the recorded conversation, Detective Mellis asked Richardson what led him to rob the Sterling Savings Bank. Richardson responded, "I'll tell you exactly what led me up to it. Place is a cake walk. Anybody could rob that thing." Ex. 31 at 5. Richardson also described his motive for the crime: "I said, I needed some money now. We're absolutely broke." Ex. 31 at 6. Richardson said the bank teller had "chumped [him] good . . . . fooled [him] pretty good" by giving him all ones and fives. Ex. 31 at 6. He remembered that he received $335 in the robbery. When asked if he remembered what he said to the bank teller at Sterling Bank, Richardson said, "I remember exactly what I said because I wanted to make damn sure I kept it simple." Ex. 31 at 8. Richardson said he did not use a note and did not have a gun. Richardson told Detective Mellis that his sons, Warren Jr. and Harold, were angry with him for planning to rob a bank and tried to talk him out of it. Richardson ignored them because he "thought [he] was gonna get a bunch of money." Ex. 31 at 10.

Richardson told Detective Mellis that he used some of the Sterling Bank robbery money to rent a motel room in north Seattle along a major north/south arterial. He admitted robbing a Frontier Bank but forgot its exact location except that it was in the north Seattle area. Although Richardson forgot what he was wearing during the Frontier

-6-

Bank robbery, he remembered other specific details. He remembered receiving more money than in the Sterling Bank robbery, and he told Detective Mellis how the Frontier Bank tellers "threw a joker into the deck" (referring to the dye pack). Ex. 31 at 14. Richardson told Detective Mellis that the dye pack exploded in his hands as he was "hauling ass, running trying to get away." Ex. 31 at 15. He rifled through the money afterward, and saved a few unburned bills.

Richardson and Detective Mellis also discussed why Richardson was in the hospital:

> Det: And then how long have you been here at the hospital?
> Sus: This'll be going on my second day.
> Det. Okay. And are you here for, just kind of review or it's just for evaluation?
> Sus: No; I'm here for a sodium deficiency, which had made me act crazy. And ah, and ah, they, they keep checking my, my chemical stats.
> Det: Um hum.
> Sus: Human beings have to have a certain amount of sodium in 'em, and mine got way too low. And it makes you dangerously, ah, defunct mentally.
> Det: Okay.
> Sus: I wish I could claim that happened before I did the robberies.
> Det: Well, so was this driven by just being broke, desperation? Is that true?
> Sus: Yes; it was. I tried to get a job. I tried everywhere to get a job. I mean I'd rather work any day. And I have a good job in Alaska, which I'm obviously not gonna get to go to now, ah.

Ex. 31 at 16. Detective Mellis also asked Richardson what he thought should happen to him, and Richardson responded, "What should happen to me is I go to jail, and ah, face up for two counts of robbery three. That's what I deserve. I mean I made sure I, I tailored it to be robbery three." Ex. 31 at 17. Richardson was adamant that he "did do those two robberies." Ex. 31 at 7.

After the interview, Detective Mellis spoke to his supervisor and decided to formally arrest Richardson.[3] Detective Mellis later executed a search warrant on Richardson's motor home. He observed reddish-pink stains on the entry door handle, captain's chair, and bathroom sink. Forensic scientist Martin McDermot analyzed swabs from the chair and the sink and found they contained the same red dye listed on the material safety data sheet for the dye pack that exploded outside Frontier Bank.

Pretrial and Trial

The State charged Richardson with two counts of first degree robbery. The defense moved under CrR 3.5 and 3.6 to suppress Richardson's statements to Detective Mellis and all evidence obtained as a result of those statements. Richardson argued that he was "in a vulnerable suggestive state" in the hospital and that he "was not free to leave his hospital room and could hardly have asked the police officer to leave." Detective Mellis and Officer Compton testified at the CrR 3.5 hearing. Richardson presented no evidence and declined to testify. Following the pretrial testimony, Richardson argued that his statements were involuntary. He blamed his medical condition and claimed that Detective Mellis spoke too fast, failed to give him a written copy of his rights, and improperly "embellished" and clarified certain rights in a way that encouraged Richardson to make a statement.

The court ruled Richardson's hospital statement admissible, finding that Richardson's rights were explained to him, he understood those rights, and he voluntarily waived them. The court discussed Richardson's mental state:

---

[3] Detective Mellis testified at the pretrial CrR 3.5 hearing that he initially did not intend to arrest Richardson and made that decision only upon consulting with his supervisor after taking Richardson's recorded statement.

As far as whether he was coherent or not, there certainly does seem to be evidence just in the statements that his memory was not 100 percent because he said several times his brain wasn't working and he had a hard time remembering. . . .

But he remembered significant details about the events and why he chose the bank because "it's a cakewalk," the amount of the money that was taken, which was not released.

RP (July 11, 2011) at 146. The court found he made a knowing, intelligent, and voluntary waiver.

After the CrR 3.5 hearing, the court entered written findings and conclusions that adopted by reference its oral findings and conclusions. The court found the following undisputed facts:

a. On November 11, 2009, Detective Mike Mellis went to Harborview Hospital and contacted the defendant. He contacted the defendant who was conscious. The defendant responded to questions put to him by Detective Mellis.
b. Detective Mellis read the defendant his Miranda warnings. The defendant acknowledged the warnings and waived the Miranda warnings orally.
c. The defendant told Detective Mellis that he did commit two bank robberies. Mr. Richardson provided the exact amount of money he remembered stealing. He said he thought that the North Bend Bank was called Cascade Bank. He also said he robbed a bank in North Seattle or Ballard called the Frontier Bank.

The court also made the following disputed findings:

a. The defendant was rational and coherent when he spoke to Detective Mellis in his hospital room.
b. He had the capacity to understand and waive his rights.
c. He did understand and waive his rights.
d. The statements he gave were voluntary. He was not coerced nor did the actions of the detective "overcome" his will.

Based on those findings, the court admitted Richardson's statement to Detective Mellis "because Miranda was applicable and the defendant's statements were made after a knowing, intelligent and voluntary waiver of his Miranda rights." RP (July 11, 2011) at 147-49. The court denied Richardson's reconsideration motion. The parties agreed to

redact portions of the taped interview that referred to Richardson's prior robbery convictions.

At trial, Richardson's son, Harold, testified about the days and weeks surrounding the robberies. Harold testified that Richardson was drinking heavily and that by late October 2009, he nearly ceased eating and vomited frequently. Harold recalled a day when Richardson picked him up in North Bend in his motor home and told him they were going to Seattle. Harold testified that they drove to the "Fremont Ballard area" and parked the motor home. RP (July 19, 2011) at 572-73. Harold bought Richardson beer and Richardson experienced dizzy spells and drank alcohol. Harold left and returned to find Richardson and the motor home gone.

When Richardson returned, he told Harold they were moving again. Richardson had red residue on his hands and jacket. Richardson then drove away erratically and high-centered the motor home in the road. They left the motor home in the road, spent the night on the street, and rented a motel room in Lynnwood the next day. They stayed at the motel for about a week. Richardson's condition worsened to the point he could not hold down alcohol. Harold left to call 911. When he returned to the motel, Richardson was gone. Concerned citizens found Richardson, and medics took him to Stevens Hospital on November 14, 2009.[4]

---

[4] When he arrived at Stevens's Emergency Department on November 14, Richardson had severe hyponatremia (low sodium), hypokalemia (low potassium), and hypochloremia (low chloride). He tested negative for alcohol but positive for cocaine and opiates. The doctors feared he might have a subarachnoid hemorrhage, so he was transferred to Harborview.

Richardson also called Dr. Stephen Juergens, a psychiatrist. He testified that at the time of the robberies, Richardson was in a "delirium" caused by electrolyte imbalance. Dr. Juergens testified that Richardson's heavy ingestion of alcohol, cocaine, and heroin, combined with lack of food, caused him to develop severe hyponatremia (sodium deficiency) that caused his delirium. According to Dr. Juergens, this delirium led to cognitive impairment and poor judgment.

The court instructed the jury on diminished capacity and voluntary intoxication. The jury rejected those defenses and convicted Richardson as charged. At sentencing, Richardson requested an exceptional sentence downward, arguing that his "capacity to appreciate the wrongfulness of his conduct, or to conform his conduct to the requirements of the law, was significantly impaired" at the time he committed the robberies. (Capitalization and boldface omitted.) He argued that he suffered from hyponatremia "brought on by [his] drinking alcohol, and not taking in adequate food and water" and that the resulting electrolyte imbalance affected his brain function. He also argued that due to his age, it was "not a frugal use of the State's resources to incarcerate him through the bulk of his remaining working years." To support his exceptional sentence request, Richardson submitted Dr. Juergens's written psychiatric evaluation, in which Dr. Juergens concluded that Richardson's "delirium" stemmed from an electrolyte imbalance that was brought on by a combination of alcohol use, vomiting, and inadequate food:

> I believe the patient did suffer from a delirium related to hyponatremia, hypokalemia, hypochloremia that occurred in the context of a lack of intake of food and heavy alcohol intake as well as the effects of use of cocaine and heroin. He is alcohol, heroin and cocaine dependent; however, I believe that it was the delirium related to the electrolyte abnormalities that was related to his lack of

intake of food, the intake of alcohol and the vomiting that he had after drinking the alcohol that caused the delirium and this led to the behavior of the bank robberies.

(Emphasis added.) The court rejected Richardson's exceptional sentence request and sentenced him to serve a concurrent standard range sentence of 129 months on each count.

## ANALYSIS

### Extrinsic Evidence

Richardson contends the jury received prejudicial extrinsic evidence during deliberations, namely an unredacted copy of his recorded statement to Detective Mellis. The State agrees that the inadvertent submission of the challenged evidence was erroneous, but contends that Richardson fails to show that the jury actually considered the extrinsic evidence and, thus, fails to establish prejudice.[5]

### Relevant Facts

As discussed above, the court admitted Richardson's recorded statement. The court granted the State and defense counsel's agreed motion to redact portions of the statement where Richardson referenced his prior robbery convictions. The State prepared an exhibit based on the redactions requested by defense counsel. The redacted statement was admitted and played to the jury. Upon hearing the exhibit, defense counsel moved, outside the jury's presence, for a mistrial based on ineffective assistance of counsel because she inadvertently missed a reference to Richardson's

---

[5] The State conceded at oral argument that the unredacted statement, if actually heard by the jury, would have prejudiced Richardson.

-12-

prior robberies when she provided her proposed redactions to the prosecutor.[6] The court agreed the statements should have been redacted but denied the mistrial motion. The court proposed that the parties redact the erroneous statement and offered to instruct the jury not to consider prior convictions. Defense counsel declined the limiting instruction over concern that it would draw attention to the error. The State then made the additional redactions to a new compact disc (CD), marked as Exhibit 29, which was provided to the jury during deliberations.

In addition to the CD containing Richardson's recorded statement, the court admitted a video disc (DVD) of the surveillance video from Frontier Bank as Exhibit 27. Richardson objected to allowing the jury unlimited access to Exhibits 27 and 29. Richardson asked that the jury be permitted to view or hear the exhibits only in open court on request. The court denied Richardson's request and allowed the jury to request the exhibits and a CD player so they could view the exhibits in the jury room.

Richardson also objected to the jury's unlimited access to his recorded statement and the video surveillance from the robberies during deliberations. The court ruled that the jury would be allowed to view the video surveillance (Exhibit 27) and listen to the redacted statement (Exhibit 29) only one time each. By supplemental instructions, the court told the jury, "Exhibit 27 may be viewed once during deliberations." However, the court neglected to inform the jury it could listen to Exhibit 29 only once. The court also instructed the jury:

---

[6] The statement defense counsel failed to redact occurred when Detective Mellis asked Richardson if he put his hand in his pocket and pointed his finger to simulate a gun "like the classic ah, movie thing" while robbing the banks. Ex. 30 at 10. Richardson responded, "I deliberately avoided that. . . . Because that's what got me in trouble the last time." Ex. 30 at 10.

Exhibit 29 was played for you during the trial, and you were allowed to follow along in the transcript. The recording had been redacted to exclude any portions that the Court determined was inadmissible. Since this exhibit was played for you in court an error was discovered. The current exhibit contains the correctly redacted version.

If you wish to view this exhibit notify the bailiff and she will bring the exhibit and a viewer into the jury room for your use. Please notify her when you have completed your viewing, so she may pick up the exhibit and the viewer.

If you choose to view this exhibit and your notes or memory of the contents of this exhibit are different from what is currently contained in the exhibit, please rely on the contents of the actual exhibit.

RP (July 20, 2011) at 659-60.

Exhibit 29 contains the properly redacted audio file of Richardson's recorded statement to Detective Mellis. Exhibit 27 contains the bank video surveillance images, but it also contains an audio file of Richardson's unredacted statement to Detective Mellis. Exhibit 27 is a DVD that contains a folder titled "Frontier Bank Ballard Branch video and stills." Ex. 27. The video surveillance images are located in that folder. Through inadvertence, Exhibit 27 also contains a folder titled "Digital Statements" and within that folder, another folder titled "Warren Richardson." Ex. 27. Richardson's unredacted recorded statement is in that folder.[7]

The jury asked to listen to Richardson's recorded statement (Exhibit 29) at 11:28 AM on July 20, 2011. The jury went to lunch at 12:00 PM that day. The jury resumed deliberations at 1:00 PM. Then, at 1:32 PM, the jury asked to view the bank surveillance video (Exhibit 27). Twenty minutes later, at 1:52 PM, the jury told the bailiff it had reached a verdict.

---

[7] The DVD also contains (1) another folder titled "Dye pack info," containing a material safety data sheet and (2) a Word document titled "Compton Witness statement." Ex. 27.

-14-

Analysis

Our Supreme Court has held, "[I]t is error to submit evidence to the jury that has not been admitted at trial." In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 705, 286 P.3d 673 (2012); see also State v. Pete, 152 Wn.2d 546, 553-55, 98 P.3d 803 (2004). "The 'long-standing rule' is that 'consideration of any material by a jury not properly admitted as evidence vitiates a verdict when there is a reasonable ground to believe that the defendant may have been prejudiced.'" Glasmann, 175 Wn.2d at 705 (quoting Pete, 152 Wn.2d at 555 n.4). See also State v. Rinkes, 70 Wn.2d 854, 862, 425 P.2d 658 (1967); State v. Boggs, 33 Wn.2d 921, 933, 207 P.2d 743 (1949) (overruled on other grounds by State v. Parr, 93 Wn.2d 95, 606 P.2d 263 (1980)). "Novel or extrinsic evidence is defined as information that is outside all the evidence admitted at trial, either orally, or by document" and is improper "because it is not subject to objection, cross examination, explanation or rebuttal." Pete, 152 Wn.2d at 552-53 (internal citations omitted).

It is undisputed that the jury received inadmissible and prejudicial evidence. The critical question is whether reasonable grounds exist to believe that Richardson may have been prejudiced by this evidence. The State contends that Richardson cannot prove the jury actually listened to the unredacted statement. The State claims that the statement was approximately 37 minutes long and only 20 minutes elapsed between the time the jury requested Exhibit 27 and the time the jury returned its verdict. Richardson argues no proof is required to show that the jury actually listened to the statement and reasonable grounds exist to believe he may have been prejudiced.

In <u>Rinkes</u>, the trial court inadvertently sent a newspaper editorial and cartoon into the jury room. <u>Rinkes</u>, 70 Wn.2d at 860. The editorial and cartoon "were most critical of supposedly lenient court decisions in criminal actions, and criticized certain allegedly liberal probation policies of some of the judges of the King County Superior Court." <u>Rinkes</u>, 70 Wn.2d at 860. Our Supreme Court found the extrinsic material inherently prejudicial:

> Here we have a case where not just the character of the defendant was attacked, but rather the alleged leniency of the judicial process in regard to criminals. The material published in the newspaper was clearly intended to influence the readers of it to be concerned about the purported leniency to alleged criminals of Seattle area judges. It was so calculated that it may well have evoked in jury members feelings or convictions of the necessity for being stricter and less careful about observing legal principles and procedure in dealing with defendants accused of crime. We think the material was very likely indeed to prejudice the cause of the defendants in this case. . . .
>
> We are convinced that the defendants were unable to meet or cope with the prejudicial effect of the material. The jury had no guidelines or specific instructions regarding it. Under the circumstances, we will not speculate at great risk to the defendants. We feel compelled to assume that the requisite balance of impartiality was upset. We note particularly that this is not a case, such as <u>State v. Adamo</u>, 128 Wash. 419, 223 P. 9 (1924), where the jury was instructed not to consider the extraneous newspaper material, and could be presumed not to have done so, since it was a matter outside the evidence. Nor do we have a case, such as <u>State v. Harris</u>, 62 Wash.2d 858, 385 P.2d 18 (1963), where interrogation of the jury by the trial court established that no jury member had read the questionable portion of a newspaper article which was found in the jury room. In the instant case, the jury was in effect instructed to consider the very likely prejudicial material since it was marked as an exhibit and they were specifically instructed to consider all the exhibits. We can only presume that the members of the jury did as they were instructed.

<u>Rinkes</u>, 70 Wn.2d at 862-63.

In <u>Pete</u>, the trial court inadvertently sent two unadmitted documents into the jury room—a police officer's written report recounting statements Pete made while being transported to the police station and Pete's own written and signed statement. <u>Pete</u>,

152 Wn.2d at 550. When the error was discovered, the bailiff retrieved the two documents and instructed the jurors to disregard them during deliberations. Pete, 152 Wn.2d at 550-51. The record did not indicate how much time elapsed between the time the bailiff took the documents into the jury room and the time she removed them from the room. Pete, 152 Wn.2d at 551 n.1. The jury convicted Pete of second degree robbery. Pete, 152 Wn.2d at 551. When polled by the trial court, "at least two or three jurors" indicated they had seen and/or read the unadmitted documents before the bailiff retrieved them. Pete, 152 Wn.2d at 551 n.2.

Pete moved for a new trial, claiming he was prejudiced by the jury's receipt of extrinsic evidence. Pete, 152 Wn.2d at 551. The trial court denied the motion, finding the error harmless because "(1) the documents were in the jury room for only a brief amount of time, (2) the jury was instructed to disregard the documents, and (3) the statements contained in the police report and Pete's written statement were exculpatory in nature." Pete, 152 Wn.2d at 551.

Our Supreme Court accepted discretionary review and reversed. The court applied the long-standing rule, discussed above, "that 'consideration of any material by a jury not properly admitted as evidence vitiates a verdict when there is a reasonable ground to believe that the defendant may have been prejudiced.'" Pete, 152 Wn.2d at 555 n.4 (quoting Rinkes, 70 Wn.2d at 862). The court noted that the two statements were not entirely exculpatory and, "when the two unadmitted statements are viewed together, they are harmful to Pete in the sense that they are contradictory and could suggest to a jury that Pete is a liar who cannot be believed." Pete, 152 Wn.2d at 554. The court determined that the extrinsic evidence prejudiced Pete: "The submission of

the two documents to the jury seriously undermined [Pete's general denial defense] and nothing short of a new trial can correct the error." Pete, 152 Wn.2d at 554-55.

In State v. Smith, 55 Wn.2d 482, 348 P.2d 417 (1960), unproven aliases went to the jury by mistake on the jury instruction cover sheet and on the verdict forms. Smith, 55 Wn.2d at 484. The State conceded the error but argued that it was harmless. Smith, 55 Wn.2d at 484. The defendant claimed prejudice, but the trial court denied her motion for new trial. Smith, 55 Wn.2d at 484. Our Supreme Court reversed, resolving any doubt about whether the jury was affected in favor of the defendant:

> It is admitted that submitting the aliases to the jury was error, but the state claims no prejudice resulted. It is common knowledge that the use of aliases is frequently associated in the public mind with the so-called 'criminal' cases. We cannot assume that the jury was unaffected by the unproved aliases. To do so would be sheer speculation. The doubt must be resolved in favor of the accused.

Smith, 55 Wn.2d at 484 (emphasis added).

Rinkes, Pete, and Smith control. In his unredacted statement, Richardson admitted to a history of robbing banks, including several robberies in 2000, only to be caught in 2001. He stated that he "used to get a bunch of money" in prior robberies. Ex. 30 at 5, 11. He also talked about being "in jail awaiting prison" for the prior robberies. Ex. 30 at 18. Richardson said that he tailored the Ballard and North Bend crimes to be "robbery three" based on his prior experience and his review of the sentencing guidelines while in prison for the prior robberies. Ex. 30 at 18. He said his parole officer made very clear he was not allowed to own a firearm. Detective Mellis also asked Richardson whether he had committed any crimes since he "got out of the joint on [his] previous robbery spree" and asked him what made him "do it again." Ex. 30 at 20. Later in the interview, Richardson stated that the Ballard and North Bend

-18-

robberies were the only two he had committed recently but confirmed that he had committed others previously.

All of these statements involve evidence of prior bad acts, made even more prejudicial because the prior bad acts involve the same crime for which Richardson was currently on trial—robbery. See State v. Acosta, 123 Wn. App. 424, 435, 98 P.3d 503 (2004) (holding that potential prejudice far outweighed probative value of testimony that defendant had previously committed the same crimes for which he was currently on trial). Admission of such evidence is strictly limited by ER 404(b) and ER 609. See ER 404; State v. Gresham, 173 Wn.2d 405, 420-21, 269 P.3d 207 (2012) (ER 404(b) is "categorical bar" to admission of evidence to prove person's character or show he acted in conformance with that character.). During trial, these statements were properly redacted except for the one defense counsel overlooked—and Exhibit 29 contained the fully redacted version. Even assuming Richardson's redacted confession was properly admitted—and taking into account all of the other untainted evidence—the unredacted statement, if heard by the jury, seriously impaired Richardson's mental impairment/voluntary intoxication defenses and detracted from his credibility. Reasonable grounds exist to believe Richardson may have been prejudiced when jurors improperly received ER 404(b) propensity evidence that the trial court had earlier excluded because of its prejudicial nature. Glasmann, 175 Wn.2d at 705. Far less prejudicial submissions to the jury have resulted in reversal. Smith, 55 Wn.2d at 484. We are not persuaded by the State's speculative claim that the time between the jury's Exhibit 27 request and its verdict means the jury never listened to the unredacted statement. As in Pete, the statement here was contained in an exhibit. The court's

instruction directed the jury to consider all the evidence.[8] Any doubt must be resolved in favor of the accused.[9] Smith, 55 Wn.2d at 484.

Additional facts indicate that Richardson may have suffered prejudice. Richardson did not testify during trial, and the jury heard evidence implicating Richardson's prior robbery. See supra note 6 and related discussion. Defense counsel made a tactical decision not to request a curative instruction, and the jury received no oral admonishment to disregard that evidence. The effect of this additional propensity evidence, together with Richardson's unredacted confession, establish prejudice. See Acosta, 123 Wn. App. at 435 (testimony that defendant had previously committed the same crimes for which he was currently on trial was highly prejudicial). Because Richardson may have suffered prejudice based on the erroneous admission of the unredacted statement, we reverse his convictions and remand for a new trial.[10]

---

[8] Because this case involves no juror misconduct, the State's reliance on case authority involving misconduct by jurors during deliberations is unpersuasive. The court erred, not the jury.

[9] The State also argues that Richardson bears the burden to show that the jury actually considered the unredacted statement. It cites no controlling authority to support this contention. See State v. Logan, 102 Wn. App. 907, 911, 10 P.3d 504 (2000) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.") (quoting DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962)).

[10] We conclude the error was not harmless given all of the circumstances in this case as discussed above.

Richardson's Statements to Detective Mellis

Richardson argues his statements were inadmissible. He contends that (1) his mental condition rendered them involuntary and (2) Detective Mellis deliberately used an improper two-step interrogation procedure to undermine Miranda's requirements.

We review the trial court's evidentiary rulings for abuse of discretion. State v. Lane, 125 Wn.2d 825, 831, 889 P.2d 929 (1995). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or reasons. State v. Wilson, 144 Wn. App. 166, 183, 181 P.3d 887 (2008). "[T]he rule to be applied in confession cases is that findings of fact entered following a CrR 3.5 hearing will be verities on appeal if unchallenged; and, if challenged, they are verities if supported by substantial evidence in the record." State v. Broadaway, 133 Wn.2d 118, 131, 942 P.2d 363 (1997). "Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding." State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

Voluntary Waiver

Richardson contends that he did not knowingly, intelligently, and voluntarily waive his privilege against self-incrimination because he "was in the intensive care unit of a hospital due to mental disorientation." Appellant's Br. at 20 (boldface omitted). He argues that due to his significant health problems, he was "not mentally capable of understanding the Miranda warnings or executing an intelligent, knowing, and voluntary waiver of his constitutional rights." Appellant's Br. at 23 (formatting omitted).

"Miranda warnings are required when an interrogation or interview is (a) custodial (b) interrogation (c) by a state agent." State v. Lorenz, 152 Wn.2d 22, 36, 93 P.3d 133

(2004). The conclusion that a suspect is in custody turns on "whether a reasonable person in the individual's position would believe he or she was in police custody to a degree associated with formal arrest."[11] Lorenz, 152 Wn.2d at 37. "'Custody' depends on 'whether the defendant's movement was restricted at the time of questioning,' and necessarily that the police restricted that movement." State v. Butler, 165 Wn. App. 820, 827, 269 P.3d 315 (2012) (quoting Lorenz, 152 Wn.2d at 36). Whether police intend to arrest, whether the environment was coercive, or whether there was probable cause to arrest at the time of questioning are all irrelevant to the custody determination. Butler, 165 Wn. App. at 827. The relevant question is "whether the suspect's movement is restricted at the time of questioning." Butler, 165 Wn. App. at 827.

Under Butler, a person required to lie flat in bed in the ICU is not necessarily in custody for Miranda purposes when he speaks to a detective in his hospital room. Butler, 165 Wn. App. at 827-28.[12] Similar to Butler, Richardson was hospitalized due to

---

[11] In his reply brief, Richardson describes the custody determination in terms of whether a reasonable person would have felt he was not at liberty to terminate the interrogation and leave. Appellant's Reply Br. at 9. He mischaracterizes the standard. Our case law is clear that the ultimate legal question is whether a reasonable person in the defendant's position would have believed his or her freedom was curtailed to a degree associated with formal arrest. See Lorenz, 152 Wn.2d at 37; State v. Heritage, 152 Wn.2d 210, 218, 95 P.3d 345 (2004).

[12] The Butler court explained, "In State v. Kelter, for example, the court addressed whether a suspect was in custody when police interviewed him in his hospital room. 71 Wash.2d 52, 54, 426 P.2d 500 (1967). Mr. Kelter was in the hospital and under investigation for causing a fatal car crash. The court refused to conclude that Mr. Kelter was in custody even though he was confined to his hospital room because he had not 'been placed under arrest or otherwise restrained by the police.' Id. Mr. Kelter was restricted to a hospital room, by his own injuries, not by police. Mr. Butler similarly was restricted to his hospital room because of his injuries. No police were stationed inside or outside Mr. Butler's room. And it was Mr. Butler's nurse, Mr. Henry, who ultimately controlled access to Mr. Butler. These facts support the court's conclusion

his own actions. As summarized above, Detective Mellis was dressed in plain clothes. Officer Compton was in uniform and present only as a witness. He left partway through the interview and returned after Richardson was already under arrest. Per hospital protocol, Richardson's nurse directed Detective Mellis to Richardson's room after he consulted with her. Hospital protocol controlled access to Richardson, not the detective. Richardson was not restrained or under arrest during the interview.[13] Because the record indicates Richardson was not in custody during the interview, Miranda was not implicated.[14]

Due process requires that a confession be voluntary and free of police coercion. State v. Reuben, 62 Wn. App. 620, 624, 814 P.2d 1177 (1991). Whether a confession is voluntary depends on the totality of the circumstances under which it was made. State v. Aten, 130 Wn.2d 640, 663-64, 927 P.2d 210 (1996). This examination includes considerations of the location, length, and continuity of the interrogation; the defendant's maturity, education, physical condition, and mental health; and whether the police advised the defendant of his or her Miranda rights. State v. Unga, 165 Wn.2d 95, 101, 196 P.3d 645 (2008). If police tactics manipulated or prevented a defendant from

---

that Mr. Butler was not in custody when he spoke with Detective Miller." Butler, 165 Wn. App. at 827-28.

[13] Although Richardson contends that he was in a hospital bed and, thus, unable to get up and walk away from the conversation, he fails to show his freedom was curtailed "to a degree associated with formal arrest." Lorenz, 152 Wn.2d at 37.

[14] The trial court here assumed without analysis that Richardson was in custody when he made his recorded statement. See Clerk's Papers at 117 ("Miranda was applicable and the defendant's statements were made after a knowing, intelligent and voluntary waiver of his Miranda rights."). But an appellate court may affirm on any basis the record supports. State v. Norlin, 134 Wn.2d 570, 582, 951 P.2d 1131 (1998). Our review of the record indicates Richardson was not in custody.

making a rational, independent decision about giving a statement, the statement is inadmissible. Unga, 165 Wn.2d at 102. However, while "[a] police officer's promises or psychological ploys may play a part in a defendant's decision to confess, . . . 'so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary.'" State v. Rafay, 168 Wn. App. 734, 758, 285 P.3d 83 (2012) (quoting Unga, 165 Wn.2d at 102 (internal citations omitted)). We will not disturb a trial court's determination that statements were voluntary if there is substantial evidence in the record from which the trial court could have found voluntariness by a preponderance of the evidence. Broadaway, 133 Wn.2d at 129.

Richardson contends that health problems rendered him mentally incapable of understanding the Miranda warnings or voluntarily confessing. But Washington courts have held that defendants voluntarily waived their Miranda rights in far more dire circumstances. See State v. Cuzzetto, 76 Wn.2d 378, 379, 457 P.2d 204 (1969) (court found voluntary waiver where intoxicated defendant made statement to police at the scene of an accident after he was thrown from a speeding vehicle and sustained "two broken and some cracked ribs, a leg injury (which did not prevent his walking), two big lumps on his head, and, naturally, a severe shock"); Aten, 130 Wn.2d at 664 (defendant voluntarily waived her Miranda rights despite being administered Librax—an anti-anxiety medication that has confusion and drowsiness as possible side effects—six hours before speaking with police); Butler, 165 Wn. App. at 828 (quoting United States v. George, 987 F.2d 1428, 1430 (9th Cir.1993)), with approval for the proposition that a "suspect can 'voluntarily waive his Miranda rights even when he is in the hospital, on medication, and in pain.'").

-24-

Richardson acknowledged to Detective Mellis that he understood his rights. The recorded interview was not lengthy. Detective Mellis read Richardson his rights, repeated himself when Richardson requested clarification, and carefully explained the rights. Although Richardson forgot certain details of the robberies and mentioned that his brain was not working well, both Detective Mellis and Officer Compton testified that he was reasonably aware of what was going on around him and he was able to make eye contact, comprehend questions, give responsive answers, and follow the conversation.[15] The interview transcript confirms that Richardson understood the questions, was cooperative, and gave clear and appropriate answers. See State v. Saunders, 120 Wn. App. 800, 810, 86 P.3d 232 (2004) (although defendant appeared inebriated during interrogation session, he was cooperative and gave clear answers; record supported finding that defendant voluntarily waived his Miranda rights). Detective Mellis spoke to Richardson in a nonthreatening manner. No evidence

---

[15] Richardson cites no authority establishing that mere inability to remember certain details of a crime renders a confession involuntary. See Logan, 102 Wn. App. at 911 n.1 ("'Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.'") (quoting DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962)). Regarding Richardson's argument that he "had difficulty providing simple information, such as his date of birth," Appellant's Br. at 24, the record shows that in fact Richardson said "1995, 1, I said it wrong, 1951." Ex. 31 at 20. The detective then said, "Born in '51," and Richardson responded, "Yes." Ex. 31 at 20. This exchange fails to show that Richardson had trouble giving his birth year. The record also shows Richardson understood the conversation as discussed above. Regardless, a claim of mental illness or disability is only one factor for the court to consider in determining whether a confession was voluntary. State v. Davis, 34 Wn. App. 546, 551, 662 P.2d 78 (1983). Here, the court considered Richardson's mental function but properly determined that he had the capacity to waive his Miranda rights and give a confession.

67746-2-I/26

indicates that he coerced or pressured Richardson to talk.[16]  Substantial evidence

supports the trial court's finding that Richardson's statements were voluntary.

Two-Step Interrogation

Richardson contends that Detective Mellis deliberately used an improper

two-step interrogation process designed to thwart Miranda's requirements.  Specifically,

he claims, "Detective Mellis utilized a question-first process in which he interviewed Mr.

Richardson and obtained a confession and only later advised Mr. Richardson of his

Miranda rights and obtained a more detailed taped statement."[17]  Appellant's Br. at 26-

27.

---

[16] Richardson claims that Detective Mellis "took advantage of [his] weakness to obtain the confession by utilizing interview techniques that can easily lead to false confessions," provided Richardson with "information about the crimes which Mr. Richardson then adopted as his own," and "deliberately used the ruse of telling Mr. Richardson that he already knew Mr. Richardson was guilty and just needed to know if he was armed with or threatened to use a weapon." Appellant's Br. at 25.  But as discussed above, even if an officer's psychological ploys played a part in a suspect's decision to confess, as long as the decision is "a product of the suspect's own balancing of competing considerations," the confession is voluntary. Unga, 165 Wn.2d at 102 (citations omitted).  Here, no record of Richardson's initial response to Detective Mellis's "ruse" exists, so we are unable to review those statements for voluntariness.  But the recorded statement clearly shows Richardson thought about his options and decided independently to waive his Miranda rights and confess. See Ex. 31 at 3 (Ten minutes into the interview, Detective Mellis—after reading Richardson his rights—asked Richardson if he was willing to give a statement.  Richardson responded, "I've been debating about it all through this conversation" and then agreed to give a statement.). The evidence supports the trial court's conclusion that Richardson effectively waived his Miranda rights and voluntarily confessed to Detective Mellis.

[17] Richardson relies on Missouri v. Seibert, 542 U.S. 600, 616-17, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004), in which the Supreme Court disapproved of the "question first" technique of interrogation.  This technique involves successive unwarned and warned phases of interrogation, so that the Miranda warnings are given in the middle of the interrogation. Seibert, 542 U.S. at 609-11.  In Siebert, the Supreme Court held that certain "question first" interrogation practices rendered Miranda warnings ineffective.

-26-

As discussed above, Richardson was not in custody when he spoke with Detective Mellis. Even if we assume Richardson was in custody during the initial unrecorded interview and Miranda applied, the interview was not an improper two-part interrogation. See State v. Hickman, 157 Wn. App. 767, 775, 238 P.3d 1240 (2010) ("'confessions made after a deliberate, objectively ineffective mid-stream warning'" must be excluded) (emphasis added) (quoting United States v. Williams, 435 F.3d 1148, 1157-58 (9th Cir. 2006)). In determining whether police deliberately withheld the Miranda warnings, we consider "'whether objective evidence and any available subjective evidence, such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the Miranda warning.'" Hickman, 157 Wn. App. at 775 (quoting Williams, 435 F.3d at 1158-59. If the court finds no deliberateness, the admissibility of postwarning statements is governed by Oregon v. Elstad, 470 U.S. 298, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985), which holds that postwarning statements are admissible if voluntary. Elstad, 470 U.S. at 318.

The record does not support Richardson's assertion that Detective Mellis deliberately attempted to evade Miranda's requirements. Detective Mellis testified that when he arrived at the hospital, his goal was to compare Richardson's appearance with the bank surveillance photographs. When he arrived and saw the resemblance, he made a quick decision to see how Richardson would react if he said the investigation was complete. Richardson immediately admitted his involvement, and Detective Mellis read him his Miranda rights before taking a recorded statement. The prewarning questioning lasted only a few minutes, compared to the 37-minute recorded conversation. And subjectively, Detective Mellis believed that Richardson was not in

custody and read him <u>Miranda</u> rights only as a precaution because Richardson was hospitalized. The evidence does not support a conclusion that Detective Mellis deliberately attempted to withhold <u>Miranda</u> warnings in order to obtain a confession.

CONCLUSION

For the reasons discussed above, the trial court properly admitted the redacted statements. But because it is reasonable to believe that Richardson may have been prejudiced by the jury's receipt of his unredacted statement containing references to jail time and prior robberies, we reverse the convictions and remand for a new trial.[18]

WE CONCUR:

---

[18] Given our disposition, we need not address Richardson's sentencing challenge.